## UNITED STATES v. KOPP.

(District Court, D. Washington, W. D. July 24, 1901.)

INDIANS—STATUS OF PUYALLUPS—INTOXICATING LIQUORS.

A Puyallup Indian is not within Act Cong. Jan. 30, 1897 (2 Supp. Rev. St. p. 544), prohibiting the sale of intoxicating liquors to an Indian for whom the United States holds title to land in trust, or who is a ward of the government under charge of an Indian superintendent or agent, or over whom the government, through its departments, exercises guardianship; it appearing only that he has inherited from his mother land in the

Puyallup·reservation patented in 1886, pursuant to the treaty of December 26, 1854 (10 Stat. 1132, art. 6), and though Act Feb. 8, 1887 (1 Supp. Rev. St. [2d Ed.] p. 536) § 6, confers the right of citizenship on Indians to whom allotments shall be or shall have been made. Section 5, providing that patents shall be issued to the effect that the government holds the land in trust for the Indian to whom it is allotted, applies only to patents thereafter issued.

E. E. Cushman, Asst. U. S. Atty.
John Leo and J. P. Cass, for defendant.

HANFORD, District Judge. This case has been argued and submitted upon a motion in arrest of judgment after conviction of the defendant. The indictment contained three counts, but the first and third were quashed before the trial. The second count, upon which the defendant was tried, charges that the defendant, within the jurisdiction of this court, "did then and there wrongfully and unlawfully sell, give away, dispose of, and barter to a certain Indian, to wit, Walter Davis,—he, the said Walter Davis, then and there being an Indian to whom an allotment of land had been theretofore made, and the title to the same being then and there held in trust by the government,—certain spirituous, ardent, and intoxicating liquors, to wit, whisky; he, the said Walter Davis, being then and there a ward of the government under the charge of an Indian superintendent and agent, and he, the said Walter Davis, being then and there an Indian of mixed blood, over whom the government, through its departments, exercised and exercises guardianship." This count is founded upon the act of congress entitled "An act to prohibit the sale of intoxicating drinks to Indians, * * *" approved January 30, 1897 (2 Supp. Rev. St. p. 544), the material part of which reads as follows:

"That any person who shall sell, give away, dispose of, exchange, or barter any malt, spirituous, or vinous liquor, including beer, ale, and wine, or any ardent or other intoxicating liquor of any kind, whatsoever, or any essence, extract, bitters, preparation, compound, composition, or any article whatsoever, under any name, label, or brand, which produces intoxication, to any Indian to whom allotment of land has been made while the title to the same shall be held in trust by the government, or to any Indian a ward of the government under the charge of any Indian superintendent or agent, or any Indian, including mixed bloods, over whom the government, through its departments, exercises guardianship, * * * shall be punished by imprisonment for not less than sixty days, and by a fine of not less than one hundred dollars for the first offense and not less than two hundred dollars for each offense thereafter."

In support of this motion, counsel for the defendant has argued, with much learning and ability, that the statute above quoted from is unconstitutional and void, but I have reached a conclusion which makes it unnecessary for me to express any opinion on that question. I consider that there is a total failure of evidence to prove that Walter Davis, to whom whisky was furnished by the defendant, is an Indian for whom the United States government holds the title to land in trust, or that he is a ward of the government under charge of any Indian superintendent or agent, or that he is an Indian or person of mixed blood over whom the government, through its departments, exercises guardianship. The only evidence bearing upon these points

110 F.—11

tends to prove that Walter Davis is the son of an Indian mother, born in the United States; that he is recognized as a Puyallup Indian; that he has inherited from his mother a tract of land, which was assigned and patented pursuant to the treaty of December 26, 1854 (10 Stat. 1132, art. 6), between the United States and the Nisqually and other bands of Indians; and that said land is within the Puyallup reservation, which was set apart by said treaty. The sixth article of said treaty makes provision for parceling lands to the Indians in severalty, as follows:

"The president may, * * * at his discretion, cause the whole or any portion of the lands hereby reserved, or of such other lands as may be selected in lieu thereof, to be surveyed into lots, and assign the same to such individuals or families as are willing to avail themselves of the privilege, and will locate on the same as a permanent home on the same terms and subject to the same regulations as are provided in the sixth article of the treaty with the Omahas, so far as the same may be applicable."

Pursuant to this article the Puyallup reservation was surveyed into lots, and the survey was approved on the 30th of January, 1874; and thereafter, on the 30th day of January, 1886, the president signed 166 patents to Indians for tracts. These patents all contain the same recitals and operative clauses. After reciting the provision of the sixth article of the treaty above quoted, each contains the following words of conveyance:

"Now know ye, that the United States of America, in consideration of the premises, and in accordance with the directions of the president of the United States, under the aforesaid sixth article of the treaty of the sixteenth day of March, Anno Domini one thousand eight hundred and fifty-four, with the Omaha Indians, has given and granted, and by these presents does give and grant, unto the said * * * and to his heirs, the tract of land above described, but with the stipulation contained in the said sixth article of the treaty with the Omaha Indians, that the said tract 'shall not be aliened or leased for a longer term than two years, and shall be exempt from levy, sale, or forfeiture, which conditions shall continue in force until a state constitution embracing such lands within its boundaries shall have been formed, and the legislature of the state shall remove the restrictions,' and 'no state legislature shall remove the restrictions * * * without the consent of congress'; to have and to hold the said tract of land, with the appurtenances, unto the said * * *, and to his heirs, forever, with the stipulation aforesaid. In testimony whereof, I, Grover Cleveland, president of the United States, have caused these letters to be made patent, and the seal of the general land office to be hereunto affixed. Given under my hand, at the city of Washington, this thirtieth day of January, in the year of our Lord one thousand eight hundred and eighty-six, and of the independence of the United States the one hundred and tenth.

"By the President.                    Grover Cleveland,
    "[Seal.]                          By M. McKean, Secretary."

The reference in the patent to the sixth article of the treaty with the Omahas makes it proper to insert here that article. It is as follows:

"Art. 6. The president may, from time to time, at his discretion, cause the whole or such portions of the land hereby reserved as he may think proper, or of such other lands as may be selected in lieu thereof, as provided for in article first, to be surveyed into lots, and to assign to such Indian or Indians of said tribe as are willing to avail of the privilege, and who will locate on the same as a permanent home, if a single person over twenty-one years of age, one-eighth of a section; to each family of two, one-quarter section; to each family of three, and not exceeding five, one-half section; to each family of

six, and not exceeding ten, one section; and to each family of ten in number, one-quarter section for every additional five members. And he may prescribe such rules and regulations as will insure to the family, in case of death of the head thereof, the possession and enjoyment of such permanent home and the improvements thereon. And the president may, at any time, in his discretion, after such person or family has made a location on the land assigned for a permanent home, issue a patent to such person or family for such assigned land, conditioned that the tract shall not be aliened or leased for a longer term than two years, and shall be exempt from levy, sale, or forfeiture, which conditions shall continue in force until a state constitution embracing such lands within its boundaries shall have been formed, and the legislature of the state shall remove the restrictions. And if any such person or family shall at any time neglect or refuse to occupy and till a portion of the lands assigned, and on which they have located, or shall rove from place to place, the president may, if the patent shall have been issued, cancel the assignment, and may also withhold from such person or family their proportion of the annuities or other moneys due them, until they shall have returned to such permanent home and resumed the pursuits of industry; and, in default of their return, the tract may be declared abandoned, and thereafter assigned to some other person or family of such tribe, or disposed of as is provided for the disposition of the excess of said land. And the residue of the land hereby reserved, or of that which may be selected in lieu thereof, after all of the Indian persons or families shall have had assigned to them homes, may be sold for their benefit, under such laws, rules, or regulations as may hereafter be prescribed by the congress or president of the United States. No state legislature shall remove the restrictions herein provided for without the consent of congress."

A constitution for the state of Washington was adopted and the state government was organized in the year 1889, and at its first session the state legislature did all that it was competent for the legislature to do towards removing the restrictions upon the right of alienation contained in the patent and the treaties referred to by enacting a statute containing recitals referring to the treaty, and expressly authorizing said Indians to lease, incumber, grant, and alien their lands in like manner and with like effect as any other person may do under the laws of the United States and of this state, and providing that "all restrictions in reference thereto are hereby removed." Laws Wash. 1889-90, pp. 499-501. To become effective, this act of the legislature required the consent of congress, and consent was given conditionally, by a provision for a commission, to be appointed by the president, to select and appraise portions of the land not required for homes of the Indian allottees, and to supervise the sale thereof, contained in the general appropriation act for current and contingent expenses and fulfilling treaty stipulations with the Indian tribes for the fiscal year ending June 30, 1894 (27 Stat. 633). This statute contains, among other provisions, the following:

"That the Indian allottees shall not have power of alienation of allotted lands not selected for sale by said commission for a period of ten years from the date of the passage of this act, and no part of the allotted lands shall be offered for sale until the Indian or Indians entitled to the same shall have signed a written agreement consenting to the sale thereof, and appointing said commissioners, or a majority of them, trustees to sell the said land and make a deed to the purchaser thereof."

The sixth section of the act of congress entitled "An act to provide for the allotment of lands in severalty to Indians, * * *" approved February 8, 1887 (1 Supp. Rev. St. [2d Ed.] p. 536), makes all Indians born within the territorial limits of the United States to

whom allotments shall have been made under the provisions of this act, or under any law or treaty, and all Indians born within the United States who shall have voluntarily taken up their residences separate and apart from any tribe and adopted the habits of civilized life, citizens of the United States, entitled to all the rights, privileges, and immunities of such citizens. The opinion of this court with respect to the legal status of the Puyallup Indians holding lands under patents granted pursuant to the treaty of 1854 is set forth in the opinion in the case of Ross v. Eells (C. C.) 56 Fed. 855; and I cannot now state my opinion upon the same questions more concisely than by repeating the principal part of that opinion, which is as follows:

"Formerly the national government had the supreme and absolute power and right to control the Indians by reason of their condition as dependents and wards of the nation, by reason of its title in fee to all the lands reserved for their use and occupation, and by reason of the plenary power vested in congress to make laws for all the people in the territories. But step by step all these controlling powers have been devested. First the patents issued by the president pursuant to the treaty made with the Indians passed the title in fee from the United States to the patentees, subject only to the restrictions and conditions subsequent expressly declared in said treaty. No estate or reversionary interest in the patented lands is reserved or now held by the United States. The restrictions prevent alienation of the lands until authorized by a law of the state to which congress must consent, otherwise than by leases for terms not exceeding two years. The conditions subsequent are that, for specified causes, any patent may be by the president canceled, and the land so forfeited may be assigned to other Indians, or sold for the benefit of all the Indians of the tribe in common. Instead of reserving the right to terminate the estate by a re-entry for breach of the condition, as is usual in conveying an estate subject to a condition, each of these patents creates a power in the president to reassign the land or sell it. This power is not inconsistent with the complete investure of title in the patentees. Chancellor Kent says: 'Subsequent conditions are those which operate upon estates already created and vested, and render them liable to be defeated. * * * So long as these estates upon subsequent conditions continue unbroken, they remain in the same situation as if no such qualification had been annexed.' 4 Kent, Comm. (13th Ed.) 126. By this step the government lost entirely the power to control the use of the land. The second step whereby Indian proprietors of land were made citizens deprived the government of the power to coerce such Indians into making or annulling contracts, or of molesting persons upon their premises by their license, when not interfering with the operations of the government or violating any national law. The rights, privileges, and immunities of citizenship in this country include, among others, the right 'to make and enforce contracts, to sue, be parties, give evidence, and to inherit, purchase, lease, sell, and convey property.' These are fundamental rights, and of the essence of civil liberty. Civil Rights Cases, 109 U. S. 22, 3 Sup. Ct. 18, 27 L. Ed. 835. The third step transferred from congress to the state government the power to preserve peace and good order, and regulate the making of private contracts, and the use and descent of private property, within this state."

In that case Ross sued for an injunction to prevent officers of the United States from interfering with the construction of a railroad across the Puyallup reservation. The decision of this court was reversed by the circuit court of appeals upon the ground, as stated in the opinion, that the land within the boundaries of the Puyallup reservation continued to be, at the time the suit was brought, an Indian reservation, with an agent in charge, who had the right to remove all persons found there contrary to law, under the authority con-

ferred by section 2147, Rev. St. U. S. Eells v. Ross, 12 C. C. A. 205, 64 Fed. 417. Since the decision of the circuit court of appeals in that case the conditions have been materially changed by actual sales of a considerable part of the reservation under the provisions of the act of 1893 above referred to. It is certain that the purchasers from the commissioners appointed pursuant to that statute cannot be lawfully evicted from their property, and I hold that by the subdivision and alienation of a considerable part of the patented land the reservation has been abolished, except the part retained as a site for an Indian training school, and use of the government for other purposes. The circuit court of appeals agreed with this court in holding that the sixth section of the act of February 8, 1887, confers the right of citizenship upon the Puyallup Indians to whom lands were patented under the treaty of 1854; and, so far as the opinion delivered by Mr. Justice McKenna indicates the mind of the court, there is no disagreement with this court as to the nature of the estate granted by the patents. I feel justified, therefore, in adhering to the conclusion reached in that case,—that each patent conveyed a title in fee simple, subject to forfeiture upon conditions subsequent, and with a restriction upon the right of alienation for a period to be determined by future legislative enactments.

The statute of February 8, 1887, provides for allotments of lands to Indians located upon reservations created for their use, and the fifth section specifies that the patents to be issued to the allottees "shall be of the legal effect, and declare that the United States does and will hold the land thus allotted, for the period of twenty-five years, in trust for the sole use and benefit of the Indian to whom such allotment shall have been made, or, in case of his decease, of his heirs." To maintain this prosecution, the district attorney contends that, inasmuch as the sixth section of the act confers upon the Puyallup Indians the rights of citizenship, the fifth section must also affect them, and control the patents issued to them, and constitutes the government a trustee to hold the lands patented to them, for a period of 25 years. This argument is untenable. The words of the fifth section restrict its application to patents to be issued in the future, and require the trust to be declared in the patents; but the sixth section plainly expresses the intention of congress to confer the rights of citizenship upon the Indian allottees contemplated by that act, and also upon other Indians born in the United States to whom allotments shall have been made under any law or treaty, and also upon other Indians born in the United States who have voluntarily taken up residences separate and apart from any tribe of Indians, and adopted the habits of civilized life. Moreover, the patents granting lands to the Puyallup Indians were issued in 1886, and the government, having devested itself of the title, could not take it back in 1887. The act of 1893 also shows clearly that congress did not then consider the government as being a trustee holding the lands which had been patented to the Puyallup Indians. That act specifically requires the patentees to execute agreements in writing constituting the commissioners, or a majority of them, trustees to sell the lands and make deeds to the purchasers. This provision is

repugnant to any theory of the government being a trustee to hold these lands for a period of 25 years, but it is entirely consistent with the elementary principle that a valid power to sell and convey the title to property should emanate from the holder of the title, and is in effect an implied legislative determination that the title to the tracts which had been assigned to individual Indians was conveyed to them by the patents. The government continues to have and to exercise the right to restrict alienation of these lands, but it does not hold the title in trust. The Puyallup Indians holding lands under patents of the tenor above set forth are citizens of the United States, having all the rights, privileges, and immunities of other citizens, and they are not under guardianship of the United States government, nor under the charge of any Indian superintendent or agent; and the statute of 1897, prohibiting the furnishing of intoxicating drinks, flavoring extracts, bitters, and stimulants to Indians having the status and subject to the conditions therein defined, does not comprehend an Indian having the status and the rights, privileges, and immunities belonging to the Indian named in this indictment. An order will be entered sustaining the motion in arrest of judgment and discharging the defendant.