911 F.2d 341
 Silas V. CROSS; Vernon Cross, Plaintiffs-Appellants,
v.
STATE OF WASHINGTON; Booth Gardner, Hon.; Brian Boyle,
Commissioner, Commissioner of Public Lands;
Pierce County; Sheldon Cook; Patrick
Kenney; Joseph Stortini,
Defendants-Appellees.
 No. 89-35890.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted June 5, 1990.
Decided Aug. 15, 1990.
 
 Douglas D. Sulkosky, Law Offices of John R. Kramer, Tacoma, Wash., for plaintiffs-appellants.
 John W. Hough, Sr. Asst. Atty. Gen., Olympia, Wash., for defendants-appellees.
 Appeal from the United States District Court for the Western District of Washington.
 Before WRIGHT and WALLACE, Circuit Judges, and JONES,* District Judge.
 WALLACE, Circuit Judge:
 
 
 1
 The Crosses appeal from the summary judgment entered by the district court in favor of the State of Washington and various governmental entities and employees. The district court possessed jurisdiction pursuant to 25 U.S.C. Sec. 345. We have jurisdiction over this timely appeal pursuant to 28 U.S.C. Sec. 1291. We affirm.
 
 
 2
 * This case concerns a dispute over land formerly located on the Puyallup Indian Reservation in Washington. The Puyallup Indian Reservation was created by the Treaty with Nisquallys, & c., 10 Stat. 1132 (1854) (Medicine Creek Treaty). Article 6 of the Medicine Creek Treaty provides for the allotment of lands to individual Indians. In 1886, pursuant to Article 6 of the Medicine Creek Treaty, the United States allotted the Crosses' ancestor, Jimmy Cross, a patent for land on the Puyallup Reservation. This property was included in the estate of Jimmy Cross and, upon his death in 1930, was distributed to his surviving sons, Silas and George Cross. In 1938, George Cross and his wife conveyed two parcels of the land to Andre. In 1941, Andre conveyed these parcels to the State of Washington. Since 1941, the land has been used as an agricultural research facility by Washington State University.
 
 
 3
 In 1988, the Crosses filed suit in the district court challenging the validity of these last two transactions and seeking to eject the State of Washington and Washington State University from the lands. The district court entered summary judgment against the Crosses.
 
 II
 
 4
 We review the summary judgment de novo. Kruso v. International Telephone & Telegraph Corp., 872 F.2d 1416, 1421 (9th Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. Tzung v. State Farm Fire and Casualty Co., 873 F.2d 1338, 1339-40 (9th Cir.1989).
 
 
 5
 The first issue we address is whether the district court erred as a matter of law in concluding that the conveyance from George Cross to Andre was valid. The Crosses contend that since the patent issued to Jimmy Cross in 1886 was a "permanent home" patent, it could not be alienated to non-family members, and that consequently George Cross's conveyance of the property to Andre was void. To evaluate the merits of this contention, we must examine the statutory and treaty background of the allotment scheme on the Puyallup Indian Reservation.
 
 
 6
 The original allotment of land to members of the Puyallup Tribe occurred pursuant to Article 6 of the Medicine Creek Treaty. Article 6 states that the President
 
 
 7
 May, ... at his discretion, cause the whole or any portion of the lands hereby reserved, or of such other land as may be selected in lieu thereof, to be surveyed into lots, and assign the same to such individuals or families as are willing to avail themselves of the privilege, and will locate on the same as a permanent home, on the same terms and subject to the same regulations as are provided in the sixth article of the treaty with the Omahas, so far as the same may be applicable.
 
 
 8
 10 Stat. at 1133 (emphasis added). Article 6 of the Treaty with the Omahas, 10 Stat. 1043 (1854) (Omaha Treaty), to which the Medicine Creek Treaty refers, states that
 
 
 9
 the President may, at any time, in his discretion, after such person or family has made a location on the land assigned for a permanent home, issue a patent to such person or family for such assigned land, conditioned that the tract shall not be aliened or leased for a longer term than two years; and shall be exempt from levy, sale, or forfeiture, which conditions shall continue in force, until a State constitution, embracing such lands within its boundaries, shall have been formed, and the legislature of the State shall remove the restrictions.... No State legislature shall remove the restrictions herein provided for, without the consent of Congress.
 
 
 10
 Id. at 1044-45 (emphasis added). The plain language of these two treaties states that Puyallup Indians may be allotted land for "permanent homes" subject to the restrictions on alienation and leasing of the land contained in Article 6 of the Omaha Treaty. Article 6 of the Omaha Treaty, however, expressly provides that states may remove those restrictions if Congress consents. Therefore, the alienation of the land parcels by George Cross was valid under the relevant treaties if (1) the Washington legislature removed the restrictions and (2) Congress consented to the removal of those restrictions.
 
 
 11
 In 1890, the Washington legislature enacted a statute, pursuant to Article 6 of the Medicine Creek Treaty, removing all restrictions upon the sale of allotted land by Puyallup Indians. 1890 Wash.Laws 499; see also Wash.Rev.Code Sec. 64.20.010 (1966). The 1890 statute provided that the Indians "shall have power to lease, incumber, grant and alien the [land] in like manner and in like effect as any other person may do under the laws of the United States and of [Washington], and all restrictions in reference thereto are hereby removed." 1890 Wash.Laws at 500. The statute further provided, in accord with Article 6 of the Omaha Treaty, that the statute "shall take effect and be in force from and after the consent to such removal of the restrictions shall have been given by the congress of the United States." Id. at 501. This statute clearly satisfies the first requirement for the removal of restrictions on alienation under the Omaha Treaty: the removal of those restrictions by an act of the state legislature. We therefore turn to whether the second requirement mentioned in the Omaha Treaty--congressional consent--was also satisfied.
 
 
 12
 In 1893, Congress decided to remove, over time, the restrictions on alienation imposed upon the Puyallups by the Medicine Creek Treaty and the Omaha Treaty. By an Act of 1893, ch. 209, 27 Stat. 612 (1893), Congress established a commission to sell selected lands on the Puyallup reservation and provided that "Indian allottees shall not have power of alienation of the allotted lands not selected for sale by said Commission for a period of ten years from the date of the passage of this act." Id. at 633. Neither party contends that the land was selected for sale by the commission. The land was therefore subject to a ten-year restriction on alienation beginning in 1893.
 
 
 13
 In 1904, Congress acknowledged the expiration of this ten-year restriction on alienation in An Act Confirming the removal of restrictions upon alienation by the Puyallup Indians of the State of Washington of their allotted lands, ch. 1816, 33 Stat. 565 (1904). That Act stated that
 
 
 14
 the Act of Congress approved March third, eighteen hundred and ninety-three ..., authorizing the sale of the Puyallup allotted lands, with restriction upon alienation "for a period of ten years from the date of the passage" thereof, shall be taken and construed as having expressed the consent of the United States to the removal of restriction upon alienation by said Puyallup Indians to their allotted lands from and after the expiration of said period shall be given effect of having been made without any restrictions upon the power of the allottee to alienate his land.
 
 
 15
 Id. at 565 (emphasis added). As this statute clearly indicates, Congress expressly consented to the removal of all alienation restrictions imposed upon the Puyallups by the Medicine Creek Treaty. This unambiguous expression of congressional consent to the earlier Washington law removing restrictions on alienation satisfies the second condition required for the removal of the restrictions imposed by the Medicine Creek and Omaha Treaties. We therefore conclude that, since the restrictions on alienation of the land held by Jimmy Cross were removed in compliance with procedures provided for in the Medicine Creek Treaty and the Omaha Treaty, George Cross was free to alienate his parcels of land to Andre, who, in turn, was free to alienate them to the State of Washington.
 
 
 16
 The Crosses argue that this reading of the treaties is inconsistent with the notion of a "permanent home," a term mentioned in both the Medicine Creek and Omaha Treaties. They apparently believe that the designation "permanent home" means that the land may never be alienated to a non-family member. This construction of the term, however, would render Article 6 of the Omaha Treaty internally contradictory, since that treaty expressly provides that the restrictions on alienation and leasing imposed upon the permanent home allotments may be removed by a state legislature with congressional consent. We will not adopt a construction of the treaty which would render its language internally contradictory. See Hughes Air Corp. v. Public Utilities Commission, 644 F.2d 1334, 1338 (9th Cir.1981) (A "basic rule of statutory construction is that one provision should not be interpreted in a way which is internally contradictory or that renders other provisions of the same statute inconsistent or meaningless"). We therefore reject the interpretation of "permanent home" urged by the Crosses.
 
 
 17
 In a related argument, the Crosses contend that the patent conveyed to Jimmy Cross by the government entitled him only to use and occupancy of the land, rather than fee title that could be alienated. The Crosses cite no compelling authority in support of this argument. Indeed, the relevant authority on this issue clearly indicates that the United States granted the land in fee simple, not in trust. Shortly after the patent was conveyed to Jimmy Cross, the district court in the Western District of Washington observed that the patents granted to the Puyallups "conveyed a title in fee simple," subject to certain conditions, such as the restriction on alienation. United States v. Kopp, 110 F. 160, 165 (W.D.Wash.1901). The court then explained that
 
 
 18
 [t]he act of 1893 also shows clearly that congress did not then consider the government as being a trustee holding the lands which had been patented to the Puyallup Indians. That act specifically requires the patentees to execute agreements in writing constituting the commissioners, or a majority of them, trustees to sell the lands and make deeds to the purchasers. This provision is repugnant to any theory of the government being a trustee to hold these lands ..., but it is entirely consistent with the elementary principle that a valid power to sell and convey the title to property should emanate from the holder of the title, and is in effect an implied legislative determination that the title to the tracts which had been assigned to individual Indians was conveyed to them by the patents. The government continues to have and to exercise the right to restrict alienation of these lands, but it does not hold the title in trust.
 
 
 19
 Id. at 165-66. This reasoning is persuasive. Moreover, the Supreme Court has recognized that Puyallup Indians who received land pursuant to the Medicine Creek Treaty held the land in fee simple absolute. In Puyallup Tribe v. Department of Game, 433 U.S. 165, 174, 97 S.Ct. 2616, 2622, 53 L.Ed.2d 667 (1977), the Supreme Court, referring to the two statutes discussed earlier, observed that "[p]ursuant to two Acts of Congress, 27 Stat. 633 and c. 1816, 33 Stat. 565, the Puyallups alienated, in fee simple absolute, all but 22 acres of their 18,000 acre reservation." See also Puyallup Indian Tribe v. Port of Tacoma, 717 F.2d 1251, 1254 (9th Cir.1983) (pointing out that "most of the [Puyallup] reservation was allotted to individual Indians and passed into individual Indian and non-Indian ownership"), cert. denied, 465 U.S. 1049, 104 S.Ct. 1324, 79 L.Ed.2d 720 (1984). We therefore conclude that the patent issued to Jimmy Cross gave him fee simple title which could be freely alienated.
 
 
 20
 The Crosses next contend that the removal of the restrictions on alienation by Congress violated their right to due process under the fifth amendment of the Constitution. They rely upon Choate v. Trapp, 224 U.S. 665, 32 S.Ct. 565, 56 L.Ed. 941 (1912), in support of this proposition. But Choate did not hold that the removal of restraints on alienation constitutes a violation of due process. Rather, Choate held only that tax exempt status creates a property right which cannot be removed by the state without due process of law. Id. at 673-74, 32 S.Ct. at 568-69. Indeed, the Court in Choate expressly distinguished between the right to a tax exemption, which it deemed to be a property right and therefore protected by the fifth amendment, and restrictions on alienation, which it did not consider to be a property right and hence not entitled to such protection. See id. at 672-73, 32 S.Ct. at 568-69.
 
 
 21
 Finally, in their reply brief, the Crosses appear to contend that they possess aboriginal rights in the disputed property. This argument, however, was not specifically and distinctly raised and argued in the Crosses' opening brief and we therefore will not consider it. International Union of Bricklayers v. Martin Jaska, Inc., 752 F.2d 1401, 1404 (9th Cir.1985) ("[W]e will not ordinarily consider matters on appeal that are not specifically and distinctly raised and argued in appellant's opening brief.").
 
 
 22
 Because we decide that the state possesses valid title to the land, we do not need to reach the question of whether the Crosses' claims are time barred.
 
 
 23
 AFFIRMED.
 
 
 
 *
 Honorable Robert E. Jones, United States District Judge, District of Oregon, sitting by designation