# CHOATE v. TRAPP, SECRETARY OF THE STATE BOARD OF EQUALIZATION OF OKLAHOMA.

## ERROR TO THE SUPREME COURT OF THE STATE OF OKLAHOMA.

No. 809.    Argued February 23, 1912.—Decided May 13, 1912.

There is a broad distinction between the power to abrogate a statute and to destroy rights acquired under it; and while Congress, under its plenary power over Indian tribes, can amend or repeal an agreement by a later statute, it cannot destroy actually existing individual rights of property acquired under a former statute or agreement.

The individual Choctaw and Chickasaw Indian had no title or enforcible right in tribal property, but Congress recognized his equitable interest therein in the Curtis Act of June 28, 1898, 30 Stat. 505, and offered to give to him in consideration of his consenting to the distribution an allotment of non-taxable land; and the acceptance of the patent by each member of the tribe was on the consideration of relinquishment of his interest in the unallotted tribal property.

A patent for an Indian allotment containing an agreement assenting to the plan of distribution, like a deed poll, bound the grantee, although not signed by him, and the benefits constituted the consideration for the rights waived.

The tax exemption in the patents for Indian allotments under the Curtis Act was not a mere safeguard against alienation, and did not fall with the removal of restrictions from alienation by the act of May 27, 1908, 35 Stat. 312.

The removal of restrictions on alienation of Indian allotments falls within the power of Congress to regulate Indian affairs, but the provision for non-taxation is a property right and not subject to action by Congress.

The non-taxation provisions as to Indian allotted lands in the Curtis Act gave a property right to the allottees, and was binding on the State of Oklahoma.

Patents issued in pursuance of statute are to be construed in connection with the statute, and those issued to allottee Indians under the Curtis Act gave the allottees as good a title to the exemption from taxation as to the land itself; and the tax exemption constituted property of which the patentees could not, under the Fifth Amendment, be deprived without due process of law.

An exemption from taxation, of land allotted to Indians in pursuance of an agreement to distribute the tribal property, will not be construed strictly, as a gratuitous exemption to a public service corporation is ordinarily construed, but will be construed liberally under the rule that all contracts with Indians are so construed.

The tax exemption provisions of the patents to Indian allottees under the Curtis Act attached to the land for the limited period of the exemption.

Indians are not excepted from the protection guaranteed by the Federal Constitution, but their rights are secured and enforced to the same extent as those of other residents or citizens of the United . States.

*Tiger* v. *Western Investment Co.*, 221 U. S. 286, distinguished as not involving property rights but only the right of Congress to extend the period of disability to alienate the allotments, and as not intimating that Congress could by its wardship lessen any rights of property actually vested in the individual Indian by prior laws or contracts.

Oklahoma by its constitution has recognized the tax exemption in the patents of allottee Indians, and, as a vested right, it cannot be abrogated by statute.

28 Oklahoma, 517, reversed.

THE facts, which involve the taxability of Choctaw and Chickasaw Indian allotted lands in Oklahoma while in possession of the allottees, are stated in the opinion.

*Mr. Joseph W. Bailey,* with whom *Mr. J. F. McMurray* and *Mr. W. A. Ledbetter* were on the brief, for plaintiff in error.

*Mr. Charles West,* Attorney General of the State of Oklahoma, for defendants in error.

MR. JUSTICE LAMAR delivered the opinion of the court.

The eight thousand plaintiffs in this case are members of the Choctaw and Chickasaw tribes. Each of them holds a patent to 320 acres of allotted land issued under the terms of the Curtis Act (June 28, 1898, 30 Stat. 495, 507, c. 517), which contained a provision "that the land should be non-taxable" for a limited time. Before the expiration of that period the officers of the State of Oklahoma in-
stituted proceedings with a view of assessing and collecting taxes on these lands lying within that State. The plaintiffs' application for an injunction was denied.

In order to understand the issues presented by the writ of error it is necessary to refer, as briefly as possible, to certain well-known facts, and to material portions of lengthy statutes, under which the tribal property of the Choctaws and Chickasaws was divided in severalty among their members.

The Five Civilized Tribes owned immense tracts of land in territory that is now embraced within the limits of the State of Oklahoma. The legal title was in the Tribes for the common use of their members. But the fact that so extensive an area was held under a system that did not recognize private property in land, presented a serious obstacle to the creation of the State which Congress desired to organize for the government and development of that part of the country. And, with a view of removing these difficulties, it provided (March 3, 1893, 27 Stat. 612, 645, c. 209) for the appointment of the Dawes Commission, authorizing it to enter into negotiations with these Tribes for the extinguishment of their title, either by cession to the United States or by allotment, in severalty, among their members. As might have been anticipated, the Commission found that many of the Indians were greatly opposed to any change. "Some of them held passionately to their institutions from custom

and patriotism, and others held with equal tenacity because of the advantages and privileges they enjoyed." (20 H. R. Doc., 1903–4, p. 1.) After several years of negotiations their opposition was so far overcome that provisional agreements were made which contemplated most radical changes in the political and property rights of the Indians.

On April 23, 1897, the Dawes Commission and the Choctaw and Chickasaw representatives made what is known as the Atoka Agreement. It was incorporated bodily into the Curtis Act of June 28, 1898 (30 Stat. 505), and was modified by the act of July 1, 1902 (32 Stat. 641, 657, c. 1362).

These two acts, containing what is known as the Atoka Agreement and the Supplemental Agreement, provided that Indian laws and courts should be at once abolished; that there should be an enrollment of all the members of the tribe; and that the members of the two tribes should become citizens of the United States.

It was also provided, as appears from extracts copied in the margin,[1] that each member of the tribe should have

---

[1] That all the lands allotted shall be non-taxable while the title remains in the original allottee, but not to exceed 21 years from date of patent, and each allottee shall select from his allotment a homestead of 160 acres, for which he shall have a separate patent, and which shall be inalienable for 21 years from date of patent. . . . The remainder of the lands allotted to such members shall be alienable for a price to be actually paid . . . one-fourth in one year, one-fourth in three years and the balance of said alienable lands in five years from date of patent. . . . The United States shall put each allottee in possession of his allotment. . . . That, as soon as practicable after the completion of said allotment, the chiefs of the two nations shall deliver to each of the allottees patents conveying to him all the right, title and interest of the Choctaws and Chickasaws in and to the land which shall have been allotted to him in conformity with the requirements of this agreement. . . . Said patent shall be framed in accordance with the provisions of this agreement. . . . And the acceptance of his patent by said allottee shall be operative as an

allotted to him his share of the land—all of which "shall be non-taxable while the title remains in the original allottee;" that a part of the land could be sold after one year and all of it sold after five years; that the patents issued to the allottee "should be framed in conformity with the provisions of the Agreement," and that the acceptance of such patent should be operative as an assent on his part to the allotment of all land of the tribes in accordance with the provisions of the Agreement, and as a relinquishment of all his interest in other parts of the common property.

The complaint does not state when the plaintiffs received their patents, but the report of the Dawes Com-

---

assent on his part to the allotment and conveyance of all the lands of the Choctaws and Chickasaws in accordance with the provisions of this agreement, and as a relinquishment of all his right, title and interest in and to any and all parts thereof, excepting the land embraced in said patent, and excepting also his interest in the proceeds of all lands, coal and asphalt herein excepted from allotment. (Atoka Agreement, 30 Stat. 507.)

There shall be allotted to each member of the Choctaw and Chickasaw Tribes, as soon as practicable after the approval by the Secretary of the Interior of his enrollment as herein provided, land equal in value to 320 acres of the average allottable land of the nation, . . . Each member of said tribes shall at the time of the selection of his allotment, designate as a homestead out of the said allotment land equal in value to 160 acres of the average allottable land of the Choctaw and Chickasaw Nation, as near as may be, which shall be inalienable during the lifetime of the allottee, not exceeding 21 years from the date of the certificate of allotment, and a separate certificate and patent shall issue for said homestead. (642.)

All lands allotted to the members of said tribes, except such land as is set aside to each for a homestead as herein provided, shall be alienable after the issuance of patent as follows:

One-fourth in acreage in one year, one-fourth in acreage in three years, and the balance in five years; in each case from the date of patent; provided that such land shall not be alienable by allottee, or his heirs, at any time before the expiration of the Choctaw and Chickasaw tribal government for less than its appraised value. (643.)

mission for the year ending June 1, 1904 (20 H. R. Doc., 27–42), shows that the enrollment and allotment had so far progressed as to make it fair to assume that most, if not all, of the patents had been issued, and that much of the land was alienable and all of it was non-taxable when, on November 16, 1907, Oklahoma was admitted into the Union. The constitution of that State provided that all existing rights should continue as if no change in government had taken place, and that property exempt from taxation by virtue of treaties and Federal laws should so remain during the force and effect of such treaties or Federal laws.

No taxes were assessed against the lands of the plaintiffs for the year 1907, but on May 27, 1908 (35 Stat. 312, c. 199), Congress passed a general act removing restrictions from the sale and encumbrance of land held by Indians of the class to which the plaintiffs belong. Another section provided that lands from which restrictions had been removed should be subject to taxation.

Thereupon proceedings were instituted by the State of Oklahoma with a view of assessing the plaintiffs' lands for taxes. This they sought to enjoin, but their complaint was dismissed on demurrer. The case was carried to the Supreme Court of the State which held that Oklahoma was not a party to any contract with the Indians; that the United States, by virtue of its governmental power over the Indians, could have substituted title in severalty for ownership in common without plaintiffs' consent and that, for want of a consideration, the provision that the land should be non-taxable was not a contract, but a mere gratuity which could be withdrawn at will. The court thereupon overruled plaintiffs' contention that they had a vested right of exemption which prevented the State from taxing the land at this time and dismissed their suit.

1. There are many cases, some of which are cited in the opinion of the Supreme Court of Oklahoma (*Thomas* v.

*Gay,* 169 U. S. 264, 271; *Lone Wolf* v. *Hitchcock,* 187 U. S. 553, 565), recognizing that the plenary power of Congress over the Indian Tribes and tribal property cannot be limited by treaties so as to prevent repeal or amendment by a later statute. The Tribes have been regarded as dependent nations, and treaties with them have been looked upon not as contracts, but as public laws which could be abrogated at the will of the United States.

This sovereign and plenary power was exercised and retained in all the dealings and legislation under which the lands of the Choctaws and Chickasaws were divided in severalty among the members of the Tribes. For, although the Atoka Agreement is in the form of a contract it is still an integral part of the Curtis Act, and, if not a treaty, is a public law relating to tribal property, and as such was amendable and repealable at the will of Congress. But there is a broad distinction between tribal property and private property, and between the power to abrogate a statute and the authority to destroy rights acquired under such law. *Reichert* v. *Felps,* 6 Wall. 160. The question in this case, therefore, is not whether the plaintiffs were parties to the Atoka Agreement, but whether they had not acquired rights under the Curtis Act which are now protected by the Constitution of the United States.

2. The individual Indian had no title or enforcible right in the tribal property. But as one of those entitled to occupy the land he did have an equitable interest, which Congress recognized and which it desired to have satisfied and extinguished. The Curtis Act was framed with a view of having every such claim satisfactorily settled. And though it provided for a division of the land in severalty, it offered a patent of non-taxable land only to those who would relinquish their claim in the other property of the Tribe formerly held for their common use. For, the Atoka Agreement, after declaring that "all land

allotted should be non-taxable," stipulated further that each enrolled member of the Tribes should receive a patent framed in conformity with the Agreement, and that each Choctaw and Chickasaw who accepted such patent should be held thereby to assent to the terms of this Agreement and to relinquish all of his right in the property formerly held in common.

There was here, then, an offer of non-taxable land. Acceptance by the party to whom the offer was made, with the consequent relinquishment of all claim to other lands furnished a part of the consideration, if, indeed, any was needed, in such a case, to support either the grant or the exemption. *Wisconsin &c. R. R.* v. *Powers,* 191 U. S. 379, 386; *Home* v. *Rouse,* 8 Wall. 430, 437; *Tomlinson* v. *Jessup,* 15 Wall. 454, 458. Upon delivery of the patent the agreement was executed, and the Indian was thereby vested with all the right conveyed by the patent, and, like a grantee in a deed poll, or a person accepting the benefit of a conveyance, bound by its terms, although it was not actually signed by him. *Keller* v. *Ashford,* 133 U. S. 610, 621; *Hendrick* v. *Lindsay,* 93 U. S. 143.

As the plaintiffs were offered the allotments on the conditions proposed; as they accepted the terms and, in the relinquishment of their claim, furnished a consideration which was sufficient to entitle them to enforce whatever rights were conferred, we are brought to a consideration of the question as to what those rights were.

3. On the part of the State it is argued that there was, in fact, no tax exemption, but that that provision was only intended to guard absolutely against alienation of the land, whether for taxes, or at judicial sale, or by private contract. In other words, it is said that the tax exemption was only an additional prohibition against a sale, so that when the restrictions against alienation were removed by the act of 1908 (35 Stat. 312), the provision as to non-taxability went as a necessary part thereof.

But the exemption and non-alienability were two separate and distinct subjects. One conferred a right and the other imposed a limitation. The defendant's argument also ignores the fact that, in this case, though the land could be sold after five years it might remain non-taxable for 16 years longer, if the Indian retained title during that length of time. Restrictions on alienation were removed by lapse of time. He could sell part after one year, a part after three years and all except homestead after five years. The period of exemption was not co-incident with this five-year limitation. On the contrary the privilege of non-taxability might last for 21 years, thus recognizing that the two subjects related to different periods and that neither was dependent on the other. The right to remove the restriction was in pursuance of the power under which Congress could legislate as to the status of the ward and lengthen or shorten the period of disability. But the provision that the land should be non-taxable was a property right, which Congress undoubtedly had the power to grant. That right fully vested in the Indians and was binding upon Oklahoma. *Kansas Indians,* 5 Wall. 737, 756; *United States v. Rickert,* 188 U. S. 432.

4. The record contains no copy of any of the patents under which the plaintiffs hold. But the act provided that they should be framed in conformity with the Atoka Agreement. Those who signed the patent could not convey more rights than were granted by that part of the Curtis Act, nor could they, by omission, deprive the patentee of any exemption to which he was thereby entitled. The patent and the legislation of Congress must be construed together, and when so construed they show that Congress, in consideration of the Indians' relinquishment of all claim to the common property, and for other satisfactory reasons, made a grant of land which should be non-taxable for a limited period. The patent issued in

pursuance of those statutes gave the Indian as good a title to the exemption as it did to the land itself. Under the provisions of the Fifth Amendment there was no more power to deprive him of the exemption than of any other right in the property. No statute would have been valid which reduced his fee to a life estate, or attempted to take from him ten acres, or fifty acres, or the timber growing on the land. After he accepted the patent the Indian could not be heard, either at law or in equity, to assert any claim to the common property. If he is bound, so is the tribe and the Government when the patent was issued.

5. It is conceded that no right which was actually conferred on the Indians can be arbitrarily abrogated by statute. But as it is claimed that he, in fact, acquired no valid exemption, since it stands on a different footing from the grant of the land itself; and that, though the provision of non-taxability added to the value of the property, it can be withdrawn because, if not a gratuity, it is at least subject to the general rule that tax exemptions are to be strictly construed and are subject to repeal unless the contrary clearly appears. *Welch* v. *Cook,* 97 U. S. 541; *Christ Church* v. *Philadelphia,* 24 How. 300; *Wisconsin &c. R. R.* v. *Powers,* 191 U. S. 379; *Tucker* v. *Ferguson,* 22 Wall. 527; *West Wisconsin Ry.* v. *Board of Supervisors,* 93 U. S. 595, are cited in support of this proposition. Some of these cases construe general statutes containing, not a grant, but an offer of exemption to such companies as should do certain work or build certain lines of road before a given date. They hold that a statute making such an offer might be repealed even as against those companies which actually built in reliance on its terms. But these rulings are based on the theory that "the legislature was not making promises, but framing a scheme of public revenue and public improvement," (*Wisconsin &c.* v. *Powers,* 191 U. S. 387). The companies gave nothing and the State received nothing in exchange for the offer. There

was no consideration moving from one to the other. Such exemption was a mere bounty, valuable as long as the State chose to concede it, but as tax exemptions are strictly construed, it could be withdrawn at any time the State saw fit.

6. But in the Government's dealings with the Indians the rule is exactly the contrary. The construction, instead of being strict, is liberal; doubtful expressions, instead of being resolved in favor of the United States, are to be resolved in favor of a weak and defenseless people, who are wards of the nation, and dependent wholly upon its protection and good faith. This rule of construction has been recognized, without exception, for more than a hundred years and has been applied in tax cases.

For example, in *Kansas Indians*, 5 Wall. 737, 760, the question was whether a statute prohibiting levy and sale of Indian lands prevented a sale for state taxes. The rule of strict construction would have compelled a holding that the property was liable. But Mr. Justice Davis, in speaking for the court, said that "enlarged rules of construction are adopted in reference to Indian treaties." He quoted from Chief Justice Marshall, who said that "The language used in treaties with the Indians shall never be construed to their prejudice, if words be made use of susceptible of a more extending meaning . . ." Again, in *Jones* v. *Meehan*, 175 U. S. 1, it was held that "Indian treaties must be construed, not according to the technical meaning of their words, but in the sense in which they would naturally be understood by the Indians." In view of the universality of this rule, Congress is conclusively presumed to have intended that the legislation under which these allotments were made to the Indians should be liberally construed in their favor in determining the rights granted to the Choctaws and Chickasaws.

The provision that "all land shall be non-taxable" naturally indicates that the exemption is attached to the

land—only an artificial rule can make it a personal privilege. But if there is any conflict between the natural meaning and the technical construction,—if there were room for doubt, or if there were any question as to whether this was a personal privilege and repealable, or an incident attached to the land itself for a limited period, that doubt, under this rule, must be resolved in favor of the patentee.

The decision in *New Jersey* v. *Wilson*, 7 Cranch, 164, is directly in point here and especially as to the quality of the exemption. It appeared there that the Delaware Indians had claims to lands in that State lying south of the River Rariton. An agreement for a release of the claim was made between the Commissioners and the Indians, under which the latter were to receive a conveyance to a large body of land in fee. The agreement was approved by the State by an act which, among other things, declared that the land "should not hereafter be subject to any tax." The Indians, after many years, sold the land, and the State subsequently passed a statute repealing the exemption. This court, speaking by Chief Justice Marshall, held that "every requisite to the formation of a contract is found in the proceedings between the then colony of New Jersey and the Indians. The subject was a purchase on the part of the Government of extensive claims of the Indians, the extinguishment of which would quiet the title to a large portion of the province. A proposition to this effect was made, the terms stipulated, the consideration agreed upon, which is a tract of land with the privilege of exemption from taxation; and then, in consideration of the arrangement previously made, one of which this Act of Assembly is stated to be, the Indians executed their deed of cession. This is certainly a contract clothed with forms of unusual solemnity. The privilege, though for the benefit of the Indians, is annexed by the terms which create it, to the land itself, not to their persons." And it was thereupon held that the right was not affected by the

later statute repealing the exemption. The case here is much stronger. For the tax exemption, which adds value to the property, is not perpetual, but is attached to the land only so long as the Indian retains the title, and in no event to exceed twenty-one years. It is property, and entitled to protection as such, unless the fact that the owner is an Indian subject to restrictions as to alienation made a difference.

7. There have been comparatively few cases which discuss the legislative power over private property held by the Indians. But those few all recognize that he is not excepted from the protection guaranteed by the Constitution. His private rights are secured and enforced to the same extent and in the same way as other residents or citizens of the United States. *In re Heff*, 197 U. S. 488, 504; *Cherokee Nation* v. *Hitchcock*, 187 U. S. 294, 307; *Smith* v. *Goodell*, 20 Johns. (N. Y.) 188; *Lowry* v. *Weaver*, 4 McLean, 82; *Whirlwind* v. *Von der Ahe*, 67 Mo. App. 628; *Taylor* v. *Drew*, 21 Arkansas, 485, 487. His right of private property is not subject to impairment by legislative action, even while he is, as a member of a tribe and subject to the guardianship of the United States as to his political and personal status. This was clearly recognized in the leading case of *Jones* v. *Meehan*, 175 U. S. 1. There it appeared that an Indian Chief owned in fee land which fronted on a stream. The chief died, and in 1891 his son and heir, during the continuance of the tribal organization, let the land to Meehan for ten years. In 1894 he again let the same property to Jones for twenty years. In that year the Secretary of the Interior was authorized by Congress to approve the lease to Jones if the latter would increase the rental. This he did, and with the assent of the Indian and the Secretary of the Interior a lease was made to Jones. In the litigation which followed Meehan relied on the first contract made in the exercise of the Indian's right of private ownership. Jones relied on that made

under congressional authority, and although the Indian was a member of the tribe and much more subject to legislative power than these plaintiffs, the court held that the subsequent act could not relate back so as to interfere with the right of property which the Indian possessed and conveyed as an owner in fee, and while Congress had power to make treaties, it could not affect titles already granted by the treaty itself.

Nothing that was said in *Tiger* v. *Western Investment Co.*, 221 U. S. 286, is opposed to the same conclusion here. For that case did not involve property rights, but related solely to the power of Congress, to extend the period of the Indian's disability. The statute did not attempt to take his land or any right, member or appurtenance thereunto belonging. It left that as it was. But, having regard to the Indian's inexperience, and desiring to protect him against himself and those who might take advantage of his incapacity, Congress extended the time during which he could not sell. On that subject, after calling attention to the fact that "Tiger was still a ward of the Nation, so far as the alienation of these lands was concerned, and a member of the existing Creek Nation," it was said that "Incompetent persons, though citizens, may not have the full right to control their property," and that there was nothing in citizenship incompatible with guardianship, or with restricting sales by Indians deemed by Congress incapable of managing their estates.

But there was no intimation that the power of wardship conferred authority on Congress to lessen any of the rights of property which had been vested in the individual Indian by prior laws or contracts. Such rights are protected from repeal by the provisions of the Fifth Amendment.

The constitution of the State of Oklahoma itself expressly recognizes that the exemption here granted must be protected until it is lawfully destroyed. We have seen that it was a vested property right which could not be

abrogated by statute. The decree refusing to enjoin the assessment of taxes on the exempt lands of plaintiffs must therefore be reversed, and the case remanded for further proceedings not inconsistent with this opinion.

*Reversed.*