**FARRIS et al. v. UNION CENT. LIFE INS. CO.**

No. 9598—Opinion Filed April 8, 1919.

(179 Pac. 919.)

(Syllabus.)

**Taxation—Indian Lands—Exemptions.**

Lands allotted to an enrolled Choctaw freedman under the Atoka Agreement embodied in Act Cong. June 28, 1898, in pursuance of provisions of the Treaty of July 10, 1866, and Act of Choctaw Council of May 21, 1883, and which lands were to be nontaxable for a period of 21 years, or while the title remained in the original allottee, are exempt from state taxation. The allottee acquired vested rights of exemption from taxation, which were not abrogated by Act Cong. May 27, 1908, removing restrictions upon alienation and providing that the lands from which restrictions were removed should be subject to taxation.

Error from District Court, Garvin County; F. B. Swank, Judge.

Action by the Union Central Life Insurance Company against Joe Farris and another to foreclose a mortgage. Judgment for plaintiff, and defendants bring error. Reversed.

John A. McClure and Albert Rennie, for plaintiffs in error.

J. B. Dudley, for defendant in error.

PITCHFORD, J. On the 21st of May, 1916, the defendant in error commenced this

action in the district court of Garvin county to foreclose a mortgage executed by the plaintiff in error, Joe Farris, then a single man, to secure a loan of $350, evidenced by promissory note. At the time the action was filed, there was no sum for principal or interest past due on the note. The sole ground alleged in the petition was that the maker had defaulted in not paying taxes levied and assessed against the mortgaged property for the years 1909 to 1915, inclusive. The mortgage contained the provision that, in the event the mortgagor failed to pay taxes assessed for any year, then the mortgagee would have the right to foreclose. The cause was submitted to the court below upon the note and mortgage, and upon an agreed statement of facts. For a better understanding of the issue presented in this case, it will be necessary to refer briefly to certain treaties and agreements between the United States and the Choctaw and Chickasaw Tribes of Indians.

Prior to the Proclamation of Emancipation. African slavery existed in the Choctaw Nation. The majority of the Choctaws had sided with the Southern Confederacy in the war between the states. After peace was declared between the North and the South, there was still some bitterness existing in the tribe. In 1865, commissioners, representing the United States. met with delegates from the Choctaw and Chickasaw Nations at Ft. Smith, Ark., and entered into a treaty which was duly ratified and proclaimed July 10, 1866 (14 Stat. L. 769), and, among other things, provided:

"Article III. The Choctaw and Chickasaws, in consideration of the sum of three hundred thousand dollars, hereby cede to the United States the territory west of the 98 degree west longitude, known as the leased district, provided that the said sum shall be invested and held by the United States, at an interest not less than five per cent. in trust for the said nations, until the Legislatures of the Choctaw and Chickasaw Nations respectively shal have made such laws, rules, and regulations as may be necessary to give all persons of African descent, resident in the said nations at the date of the treaty of Ft. Smith, and their descendants, heretofore held in slavery among said nations, all the rights, privileges, and immunities, including the right of suffrage, of citizens of said nations, except in the annuities, moneys, and public domain claimed by, or belonging to, said nations respectively; and also to give to such persons who were residents as aforesaid, and their descendant. forty acres each of the land of said nations on the same terms as the Choctaws and Chickasaws, to be selected on the survey of said land, after the

Choctaws and Chickasaws, and Kansas Indians have made their selections as herein provided; and immediately on the enactment of such laws, rules, and regulations, the said sum of three hundred thousand dollars shall be paid to the said Choctaw and Chickasaw Nations in the proportion of three-fourths to the former and one-fourth to the latter,—less such sum, at the rate of one hundred dollars per capita, as shall be sufficient to pay such persons of African descent before referred to as within ninety days after the passage of such laws, rules, and regulations shall elect to remove and actually remove from the said nations, respectively, And should the said laws, rules, and regulations not be made by the Legislatures of the said nations respectively, within two years from the ratification of this treaty, then the said sum of three hundred thousand dollars, shall cease to be held in trust for the said Choctaw and Chickasaw Nations, and be held for the use and benefit of such of said persons o. African descent as the United States shall remove from the said territory in such manner as the United States shall deem proper,—the United States agreeing, within ninety days from the expiration of the said two years, to remove from said nations all such persons of African descent as may be willing to remove; those remaining or returning after having been removed from said nations to have no benefit of said sum of three hundred thousand dollars, or any part thereof. but shall be upon the same footing as other citizens of the United States in the said nations."

On May 21, 1883, the Choctaw Council, for the purpose of carrying into effect the conditions and provisions of the above act, passed a law conferring upon the Choctaw freedmen all the rights, privileges, and immunities belonging to citizens of the Choctaw Naton. Sections 1, 2, and 3 of the Act of the Choctaw Council, supra, are as follows:

"Section 1. Be it enacted by the General Council of the Choctaw Nation assembled; That all persons of African descent, resident in the Choctaw Nation at the date of the treaty of Ft Smith September 13. 1865, and their descendants formerly held in slavery by the Choctaws or Chickasaws, are hereby declared to be entitled to, and invested with all the rights, privileges and immunities. in cluding the rights of suffrage. of citizens of the Choctaw Nation. except in the annuity moneys and the public domain of the nation.

"Sec. 2. Be it further enacted: That all said persons of African descent, as aforesaid, and their descendants, shall be allowed the same rights of process. civil and criminal, in the several courts of this nation. as are allowed to Choctaws, and full protection of person and property is hereby granted to all such persons.

"Sec. 3. Be it further enacted: That all

said persons are hereby declared to be entitled to forty acres each of the lands of the nation, to be selected and held upon the same terms as the Choctaws."

On the 23d of April, 1897, there was made between the United States and the Choctaw and Chickasaw Nations what is known as the Atoka Agreement, and which was incorporated into the Curtis Act of June 28, 1898, c. 517, 30 Stat. 495. Section 29 of the Atoka Agreement provided:

"That each member of the Choctaw and Chickasaw Tribes, including Choctaw and Chickasaw freedmen, shall, where it is possible, have the right to take his allotment on land, the improvements on which belong to him, and such improvements shall not be estimated in the value of his allotment." And further: "All the lands allotted shall be nontaxable while the title remains in the original allottee, but not to exceed twenty-one years from date of patent, and each allottee shall select from his allotment a homestead of one hundred sixty acres, for which he shall have a separate patent, and which shal be inalienable for twenty-one years from date of patent. This provison shall also apply to the Choctaw and Chicksasaw freedman to the extent of his allotment."

It is clear from the foregoing that all the rights given to the Choctaw Indian relative to his allotment apply with equal force to the allotments of the freedmen. After the admission of Oklahoma as a state, Congress, by the Act of May 27, 1908, c. 199 (35 Stat. L. 312), provided:

"That from and after sixty days from the date of this act and status of the lands allotted heretofore or hereafter to allottees of the Five Civilized Tribes shall, as. regards restriction on alienation or incumbrance, be as follows: "All lands, including homesteads, of said allottees enrolled as intermarried whites, as freedmen, and as mixed-blood Indians, having less than half Indian blood including minors shall be free from all restrictions." Section 1.

By section 4 of said act, it is further provided:

"That all land from which restrictions have been, or shall be, removed shall be subject to taxation and all other civil burdens as though it were the property of other persons than allottees of the Five Civilized Tribes."

In the case of Choate et al., Trapp. 224 U. S. 665, 32 Sup. Ct. 565, 56 L. Ed. 941, the question involved was as to whether the allotments of the Choctaw and Chickasaw Indians were subject to taxation under the above act. Justice Lamar, delivering the opinion of the court, said:

"1. There are many cases, some of which are cited in the opinion of the Supreme Court of Oklahoma (Thomas v. Gay, 169 U. S. 271, 42 L. Ed. 743, 18 Sup. Ct. 340; Lone Wolf v. Hitchcock, 187 U. S. 565, 47 L. Ed. 306, 23 Sup. Ct. 216), recognizing that the plenary power of Congress over the Indian tribes and tribal property cannot be limited by the treaties so as to prevent repeal or amendment by a later statute. The tribes have been regarded as dependent nations, and treaties with them have been looked upon not as contracts, but as public laws which could be abrogated at the will of the United States.

"This sovereign and plenary power was exercised and retained in all the dealings and legislation under which the lands of the Choctaws and Chickasaws were divided in severalty among the members of the Tribes. For, although the Atoka Agreement is in the form of a contract, it is still an integral part of the Curtis Act, and, if not a treaty, is a public law relating to tribal property, and as such was amendable and repealable at the will of Congress. But there is a broad distinction between tribal property and private property, and between the power to abrogate a statute and the authority to destroy rights acquired under such law. Reichart v. Felps, 6 Wall. 160, 18 L. Ed. 849. The question in this case, therefore, is not whether the plaintiffs were parties to the Atoka Agreement, but whether they had not acquired rights under the Curtis Act which are now protected by the Constitution of the United States.

"2. The individual Indian had no title or enforceable right in the tribal property. But as one of those entitled to occupy the land he did have an equitable interest, which Congress recognized and which it desired to have satisfied and extinguished. The Curtis Act was framed with a view of having every such claim satisfactorily settled. And though it provided for a division of the land in severalty, it offered a patent of nontaxable land only to those who would relinquish their claim in the other property of the tribe formerly held for their common use. For, the Atoka Agreement, after declaring that 'all land allotted should be nontaxable,' stipulated further that each enrolled member of the Tribes should receive a patent framed in conformity with the agreement, and that each Choctaw and Chickasaw who accepted such patent should be held thereby to assent to the terms of this agreement and to relinquish all of his right in the property formerly held in common.

"There was here, then, an offer of nontaxable land. Acceptance by the party to whom the offer was made, with the consequent relinquishment of all claim to other lands furnished a part of the consideration, if, indeed, any was needed, in such a case, to support either the grant or the exemption. Wiscon-

sin & M. R. Co. v. Powers, 191 U. S. 386, 48 L. Ed. 231, 24 Sup. Ct. 107; Home of the Friendless v. Rouse, 8 Wall. 437, 19 L. Ed. 497; Tomlinson v. Jessup, 15 Wall. 458, 21 L Ed. 205. Upon delivery of the patent the agreement was executed, and the Indian was thereby vested with all the right conveyed by the patent, and, like a grantee in a deed poll, or a person accepting the benefit of a conveyance, bound by its terms, although it was not actually signed by him. Keller v. Ashford, 133 U. S. 621, 33 L. Ed. 672. 10 Sup. Ct. 494: Hendrick v. Lindsay, 93 U. S. 143, 23 L Ed. 855.

"As the plaintiffs were offered the allotments on the conditions proposed, as they accepted the terms and in the relinquishment of their claim, furnished a consideration which was sufficient to entitle them to enforce whatever rights were conferred, we are brought to a consideration of the question as to what those rights were. * * * The right to remove the restriction was in pursuance of the power under which Congress could legislate as to the status of the ward and lengthen or shorten the period of disability. But the provision that the land should be nontaxable was a property right, which Congress undoubtedly had the power to grant. That right fully vested in the Indian and was binding upon Oklahoma."

The Choctaw freedmen possess the same rights and immunities with regard to their allotted lands as do the Indians. The grant to them of nontaxable lands is the same as that to the Choctaw Indian allottee and founded upon the same treaty and agreement and upon a valid consideration.

We have seen that the lands allotted to the Choctaw and Chickasaw Indians were nontaxable for a period of 21 years, provided title remained in the original allottee for that time; and further, that this provision should apply to the Choctaw and Chickasaw freedmen to the extent of their allotment. Under the act of the Choctaw council of the 21st of May, 1883, supra, it was declared that the freedmen should be entitled to and invested with all the rights, privileges and immunities, including the rights of suffrage of citizens of the Choctaw Nation: in other words, he is clothed with all the political rights of the Choctaw: he had a voice in saying whether or not the agreement made with the United States should be ratified or rejected by the Choctaw Nation, and if the allotment of the Choctaw Indian is not subject to taxation and so held, we are of the opinion that the land of the Choctaw freedman is equally exempt.

The case of Allen et al. v. Trimmer, 45 Okla. 83, 144 Pac. 795, arose out of an effort to subject the lands of Chickasaw freedmen to taxation. Bleakmore, J., delivering the opinion, draws a distinction between the tenure of the freedmen to their allotments in the Choctaw and Chickasaw Nations respectively in the following language:

"It would require a most unnatural construction of the terms of the Atoka Agreement to hold that it was the intention of Congress to extend the grant of tax exemption therein made to allotments other than those it contemplated and provided for. Had subsequent legislation enlarged upon the same grant of lands made to the freedmen by the Atoka Agreement, and had allotments actually been made to them thereunder (such as were made to Indian allottees), then it might with reason be said that the tax exemption granted by the terms of said agreement was continued and extended so as to embrace freedmen allotments."

The opinion last cited was by a divided court. Justices Turner and Kane dissenting. The court as now composed expresses a grave doubt as to the correctness of the conclusion reached in that case, holding the lands of Chickasaw freedmen taxable, but, in view of the fact that the allotment there was that of a Chickasaw freeman, while here it is that of a Choctaw freedman, we refrain from disturbing the opinion, the case being here cited for the purpose of showing that the court here practically held the allotment of a Choctaw freedman was not subject to taxation.

In view of the foregoing, we are of the opinion that the judgment of the trial court, holding that the allotment of the plaintiffs in error was subject to taxation, was erroneous and should be reversed, and it is so ordered.

All the Justices concur.