## GROTKOP v. STUCKEY, Co. Treas., et al.

No. 18987. Opinion Filed July 2, 1929.

Opinion Withdrawn, Corrected, Refiled and Rehearing Denied Nov. 26, 1929.

Ellis A. Robinson and Quincy J. Jones, for plaintiff in error.

N. C. Orr and Eugene Rust, for defendant in error Western Construction Company.

Randolph, Haver, Shirk & Bridges, for defendants in error W. W. Stuckey, Alfred C. Comstock, A. W. Smedley, and Comstock-Smedley Company.

DIFFENDAFFER, C. May 6, 1925, Vinita C. Grotkop commenced an action in the district court of Tulsa county against W. W. Stuckey, county treasurer of Tulsa county, Alfred C. Comstock, Gordon L. Smedley, and Comstock-Smedley Company, in which she sought to enjoin the issuance of a tax deed by the county treasurer to the defendants for a tract of land described as block 13 in Capitol Hill Second addition to the city of Tulsa. In her petition she alleged that she is a one-thirty-second blood Cherokee Indian enrolled opposite No. 11917, and a member of the Cherokee Tribe of Indians; that, as such, she was allotted as her homestead allotment certain lands, in-

cluding the block above described; that she is still the owner of said block; that taxes had theretofore been assessed against said block by the taxing authorities of Tulsa county; that she had tendered to the county treasurer the full amount of general taxes. but the county treasurer refused to accept same, and insists that in addition to the general taxes, plaintiff should pay certain void and illegal sewer assessment which had been levied and assessed against said block, by reason of a sewer which had been constructed across same; that said sewer assessment was void for the reason that said block was no part of the city of Tulsa. and that said block was a part of her Indian homestead allotment granted to her, exempt from all taxation; that the county treasurer had issued tax certificates covering said land, and had sold same for taxes and special sewer assessments for the years 1921, 1922 and 1923; that defendants Comstock. Smedley, and the Comstock-Smedley Company are the owners of said certificate, and had applied to the county treasurer for tax deeds; that the county treasurer threatens and is about to issue tax deeds conveying said premises to defendants.

Plaintiff applied for and obtained a temporary injunction. Defendants filed their answer in which they admitted that plaintiff is 1/32 blood Cherokee Indian, enrolled as such, and the homestead allotment as alleged by plaintiff; but deny that all of block 13 (the land here in controversy) constitutes a part of such homestead allotment, and allege the fact to be that only the east 166 2/3 feet of said block is within the homestead allotment, and that the remainder thereof (the west 133 1/3 feet) is not within the homestead allotment; they admit that plaintiff is still the owner of block 13, but deny that she is the owner of the remainder of her homestead, and allege that all the balance of the homestead allotment has been platted by her as an addition to the city of Tulsa, and that all or nearly all of her homestead allotment was sold by her as platted. They admit that block 13 has been assessed for general taxes and for special sewer assessments, but deny that such assessments were illegal, and assert that all of block 13 was legally liable for the ad valorem taxes and also taxation for sewers and other public improvements. They also admit the issuance of the tax certificates. and that they are the owners thereof, and that the county treasurer was about to issue tax deeds for said block to them; and assert that all the acts performed and threatened to be performed by the county that Comstock, Smedley, and Comstock-Smedley Company are entitled to a deed from the county treasurer for said block 13. It is then alleged that plaintiff acquired her surplus allotment before March 13, 1908, and her homestead allotment before May 21, 1906, and that thereafter, in 1916, 1917 and 1918, she platted a large portion of her allotments, including block 13, as additions to the city of Tulsa, and that, on April 22, 1918, she filed an amended plat, "dedicating said property to town-site purposes as an addition to the city of Tulsa."

It is then alleged, by reason of her acts, plaintiff waived the exemption of her homestead from taxation, and especially that part of block 13 included therein, and that by reason thereof plaintiff is now estopped from denying that said block 13 and every part thereof is subject to ad valorem taxes and special improvement assessments, and is estopped from denying the validity of the assessments involved. Defendants pray that the special assessments and taxes be confirmed, the sale by the county treasurer be ratified, and that the treasurer be directed to issue deed to said premises pursuant to the sale. Plaintiff replied by general denial.

September 18, 1926, the Western Construction Company commenced an action in the district court of Tulsa county against B. M. Grotkop, Vinita C. Grotkop, Alfred C. Comstock, Gordon L. Smedley. Comstock-Smedley Company, and the city of Tulsa, in which it sought judgment based upon a "tax bill" issued by the city of Tulsa on the 6th day of March, 1925, under the provisions of the charter and ordinances of the city of Tulsa, in payment to said construction company for certain paving and street improvements, and for foreclosure of a lien claimed by it upon the south one-half of said block 13. The amount of the "tax bill" was $2,694.55 payable in ten annual installments with coupons attached representing the amount of each installment. The first installment was due April 1, 1926, and by the terms of the "tax bill." it was provided that default in the payment of any installment, or any part thereof, or the interest thereon. may at the option of the holder mature all installments for all purposes. Appropriate allegations of ownership, default, maturity. etc., were made.

Comstock, Smedley, and Comstock-Smedley Company answered by reference to the claims made by them in their answer in the injunction suit, and claimed their lien to

be superior to the lien of the construction company. Vinita C. Grotkop's answer set out in substance substantially the same allegations as were contained in her petition for the injunction; that is, that block 13 was a part of her Indian homestead allotment, was still owned by her, and was therefore not subject to the debt or "tax bill."

Replies were filed consisting of general denials. Thereafter this cause was consolidated with the injunction suit, and trial was had resulting in a judgment declaring the tax sale proceedings valid, directing the county treasurer to issue a tax deed as prayed for by Comstock and Smedley, and in a judgment in favor of the construction company upon its "tax bill," and declaring same a first and prior lien upon the south one-half of block 13, foreclosing the lien and directing the sale of that part of the block covered by the "tax bill." From this judgment and decree. Vinita C. Grotkop appeals.

The single question presented is the liability of that part of block 13, which was a part of the original homestead allotment, for the special sewer and paving assessments.

There is but little controversy concerning the facts. From the record, it clearly appears that Vinita Crutchfield (now Grotkop) is a 1/32 blood Cherokee Indian; that as such she was allotted, as her homestead allotment, 30 acres of land within the S. W. ¼ sec. 31, twp. 20 north of range 13 E. The allotment patent is dated January 30, 1908, and includes the east 166 2/3 feet of the block in controversy, title to which she still retains. Her surplus allotment deed is dated January 30, 1908, and includes a tract of land about 540 feet wide lying immediately west of the homestead allotment. Block 13 is 300 feet by 300 feet, the line running north and south between the homestead allotment and the surplus allotment runs about 16 2/3 feet west of the center of the block. About April, 1912, she platted all that part of her surplus allotment, except that part thereof included in block 13, into lots and blocks, designated on the plat as "Capital Hill Subdivision." About May 13, 1916, she platted a portion of her homestead allotment designated as "Capital Hill Second Addition" to the city of Tulsa. Amended plats were filed up to some time in 1918. In these several plats, block 13 was shown as being comprised of a part of the surplus and part of the homestead allotment in the proportion above stated. All the other blocks were subdivided into lots. Block 13 was not subdivided into lots and was marked and designated on the several plats as "homestead."

No alley was shown through this block. In all other blocks, within the homestead land, alleys running north and south through the center of the blocks are shown. Ordinances were thereafter adopted by the city of Tulsa, whereby these additions, with other lands, were brought within the corporate limits of the city of Tulsa. In March, 1921, an ordinance was adopted creating sewer district No. 175, within which was included block 13, and declaring a necessity for the construction of sanitary sewers, laterals, etc., in said sewer district. Under a contract between the city and Comstock-Smedley Company, sanitary sewers were constructed, and on October 21, 1921, an ordinance was adopted apportioning the cost of the construction of the sewer, and levying and assessing special taxes against the several lots, tracts and parcels of land within the district. By this ordinance, block 13 was charged and assessed as follows: E. 1/2 $788.81; W. ½ $788.81. A main sanitary sewer was constructed, running north and south through the center of block 13. At that time all the lots within the second addition subject to such assessments outside of block 13 except three had been sold. Block 13 was fenced at the time the sewer was constructed. It had a dwelling house thereon, and the allottee had lived there and occupied it as a home for some years after the land was platted, but had not lived there for some years next before the trial. She did not give her consent to the construction of the sewer through the block, and protested the entry of the contractors, but over her protest the fence was torn down and the sewer constructed through the block. After the sewer was completed at the instance of the contractor, she signed an instrument showing that she claimed no interest in certain lots which the records showed stood in her name. Block 13 was not included in this instrument. It was signed for the purpose of validating the assessments as to the lots included therein. Block 13 seems to have been assessed for general taxes, which the owner offered to pay, but the sewer assessments not having been paid were certified to the county treasurer, and by him placed upon the tax rolls as other delinquent taxes; the block was sold to the county for the taxes, including the assessments for the years 1921, 1922, 1923 and 1924, and was advertised for resale, at which sale Comstock and Smedley and Comstock-Smedley Company bid the property in.

By section 11 of the Act of Congress of July 1, 1902, ratified by the Cherokee Na-

tion August 7, 1902, being the act providing for the allotment of the lands of the Cherokee Nation, it is provided:

"There shall be allotted by the Commission to the Five Civilized Tribes and to each citizen of the Cherokee Tribe, as soon as practicable after the approval by the Secretary of the Interior of his enrollment as herein provided, land equal in value to 110 acres of the average allottable lands of the Cherokee Nation, to conform as nearly as may be to the areas and boundaries established by the government survey, which land may be selected by each allottee so as to include his improvements."

Sections 59 and 60 of the same act provide:

"Sec. 59. All conveyances shall be approved by the Secretary of the Interior which shall serve as a relinquishment to the grantee of all the right, title, and interest of the United States in and to the lands embraced in his patent."

"Sec. 60. Any allottee accepting such patent shall be deemed to assent to the allotment and conveyance of all the lands of the tribe as provided in this act, and to relinquish all his right, title, and interest to the same, except in the proceeds of lands reserved from allotment."

Section 13 provides:

"Each member of said tribe shall, at the time of the selection of his allotment, designate as a homestead out of said allotment land equal in value to 40 acres of the average allottable lands of the Cherokee Nation, as nearly as may be, which shall be inalienable during the lifetime of the allottee, not exceeding 21 years from the date of the certificate of allotment. Separate certificate shall, issue for said homestead. During the time said homestead is held by the allottee, the same shall be nontaxable and shall not be liable for any debt contracted by the owner thereof while so held by him."

The case of Choate v. Trapp, 224 U. S. 665, 56 L. Ed. 941, construes provisions in the Choctaw and Chickasaw Allotment Act (Act of June 28, 1898, 30 Stat. at L. 505, chap. 517), which contains almost identical provisions, except that the period of tax exemption therein is while the title remains in the original allottee, but not to exceed 21 years from the date of the patent. It was therein held:

"Any doubt as to whether the tax exemption provision in the Act of June 28, 1898, allotting lands in severalty to the members of the Choctaw and Chickasaw Tribes, was a personal privilege and repealable, or an incident attached to the land itself for a limited period, must be resolved in favor of the patentees."

And further:

"Choctaw and Chickasaw allottees under the Atoka Agreement embodied in the Act of June 28, 1898, under which in part consideration of their relinquishment of all claim to the tribal property, they were to receive allotments of the lands in severalty, which were to be nontaxable for a specified period, while the title remained in the original allottees, acquired vested rights of exemption from state taxation, protected by U. S. Const. 5th Amend., from abrogation during that period, as was attempted by the Act of May 27, 1908 (35 Stat. at L. 312, chap. 199), removing the restrictions upon alienation, and providing that lands from which such restrictions had been removed should be subject to taxation."

The right to tax the lands involved in Choate v. Trapp, supra, was asserted under the provisions of the Act of Congress of May 27, 1908, whereby the restrictions from sale and incumbrance of land held by Indians of the class involved in that case were removed, and which also provided that lands from which restrictions had been removed should be subject to taxation. It was there held that the tax exemption was a vested right which the Indians acquired, for the consideration in part of their release of all their claims as individuals to the tribal property, and that such rights are protected from abrogation by the provisions of the Fifth Amendment to the Constitution of the United States. Defendants in error concede that Choate v. Trapp, supra, if applicable here, precludes Congress and the sovereign state of Oklahoma from forcibly striking down the right of nontaxability extended to plaintiff in error by the treaties and legislative enactments. But it is contended that Choate v. Trapp, supra, is not applicable to the case at bar, for the reason that plaintiff by her own acts has waived the exemption and consented to its removal. Sweet v. Schock, 245 U. S. 192, 62 L. Ed. 237, is relied upon, and particularly the following extract from the opinion:

"The right or privilege of exemption from taxation cannot be taken from an allottee's land while he retains the title. Its surrender may not be forced from him, but he may yield it in bargain for another right or privilege."

There the court had under consideration the provisions of the Act of Congress of March 1, 1901, ratifying and confirming the Original Creek Agreement and the Act of June 30, 1902 (Supplemental Creek Agreement).

182

The first act provided that the land should "be nontaxable * * * for 21 years," and the latter act provided that the land should "be and remain nontaxable * * * for 21 years from the date of the deed." The case construes these acts in connection with the Act of March 3, 1903, in which it was enacted:

"That nothing herein contained shall prevent the survey and platting at their own expense of town site by private parties where stations are located along the line of railroads, nor the unrestricted alienation of lands for such purposes, when recommended by the Commission to the Five Civilized Tribes and approved by the Secretary of the Interior."

There a Creek allottee, Sarah Smith, petitioned for the removal of the restrictions against alienation of her homestead allotment, for the purpose of permitting her to sell part of the land for town-site purposes. The Act of Congress of April 26, 1906, provided:

"That all lands upon which restrictions are removed shall be subject to taxation, and the other lands shall be exempt from taxation as long as the title remains in the original allottee."

The Act of May 27, 1908, provides:

"That all lands from which restrictions have been or shall be removed shall be subject to taxation and all other civil burdens as though it were the property of other persons than allottees of the Five Civilized Tribes."

After the passage of the Act of April 26, 1906, the allottee petitioned for and obtained removal of restrictions and sold a part of her allotment to one Boyd, and after the passage of Act of May 27, 1908, she platted another portion of her allotment and sold it for town-site purposes. In the body of the opinion, the court said:

"Sarah Smith invoked a removal of the limitation, the restriction upon alienation, and could only receive the benefit of the law by accepting the consequences of the law. It would indeed have been anomalous to give her power to erect a town and convey its lots free from taxation."

The parties resisting the right of the state to tax the land in Sweet v. Shock, supra, cited the case of State of New Jersey v. Wilson, 7 Cranch, 164, and the court in holding against their contention said:

"New Jersey v. Wilson, 7 Cranch, 164, is adduced by plaintiffs in error to sustain their contention. That case passed upon a grant of the state of New Jersey to certain

Indians, 'with the privilege of exemption from taxation.' It was decided that the privilege, though for the benefit of the Indians, was annexed by the terms which created it to the land itself, not to their persons. And this was an advantage to the Indians, it was said, 'because, in the event of sale, on which alone the question could become material, the value would be enhanced by it.' But it was further said it was not doubted that the state might have insisted on a surrender of the privilege as the sole condition on which a sale of the property should be allowed. Such condition is imposed by the acts of Congress which we have mentioned, when voluntarily invoked by an allottee. And there is no hardship in this."

It was upon the theory that Congress had imposed the condition of surrender of the privilege of exemption from taxation for which the allottee might obtain the removal of restrictions against alienation, in order that she might sell the land for town-site purposes, that the court held the land subject to taxation, and used the language heretofore quoted and relied upon by defendants in error; this is, in effect, to say, that the allottee had bargained for the removal of restrictions against alienation, and to obtain the same surrendered the privilege of exemption from taxation. It is this principle that defendants in error seek to invoke in order to uphold the validity of the assessments against the land of plaintiff in error. We are unable to see wherein the principle is applicable. There was no condition whatever attached to the removal of restrictions against alienation of the land in question. By the Act of Congress of May 27, 1908, it is provided:

"That from and after 60 days from the date of this act, the status of the land allotted heretofore or hereafter to allottees of the Five Civilized Tribes shall, as regards restrictions on alienation or incumbrance, be as follows: All lands, including homesteads of said allottees enrolled as intermarried whites, as freedmen, and as mixed-blood Indians having less than half Indian blood, including minors, shall be free from all restrictions."

From and after the date provided in that act, plaintiff in error was free to sell and convey any part of her homestead allotment for any purpose whatever. As soon as any part thereof was sold, it became subject to taxation under the provisions of the Original Cherokee Agreement, which provided for the exemption from taxation and nonliability for any debt contracted by the owner only during the time it was held by the allottee. She surrendered nothing, nor was she re-

quired to surrender anything, in order to secure the removal of restrictions. So no bargain was had nor required for the removal of the restriction.

It is contended, however, that by her acts, plaintiff in error had "bargained" with the city of Tulsa; that by platting the land and dedicating the streets and alleys therein, and receiving the advantages and benefits accruing to property within the corporate limits of the city of Tulsa, she must be deemed to have surrendered the privilege of tax exemption and exemption from liability for debt, conferred upon her land by the treaty and Acts of Congress. With this contention, we cannot agree. It is not shown that plaintiff in error ever petitioned or asked that her land or any part thereof be brought within the corporate limits of the city of Tulsa. True, she sold a part of her homestead allotment to others, and thereby placed it within their power to petition the city to be brought within its corporate limits. True, she waived her rights as to certain other lots, but when she platted the land, she plainly marked and designated the block here in question as a "homestead," enclosed it with a fence, dedicated no alley through the block as in other blocks, and in many ways indicated that it was not her intention to part with the title to this portion of her allotment. She objected to running the sewer through this block, and over her protest the city, or contractor, tore down the fence and constructed the sewer. When asked to waive her exemption as to the assessments, she did not do so as to this block, and at no time does the record disclose that she consented or agreed to the charges sought to be assessed against her land.

We conclude that that part of the block which was a part of the homestead allotment was not and is not subject to taxation for any purpose while title thereto remains in the original allottee.

It is argued that as to special assessments for public improvement, such as sewers and street improvements, the exemption from taxation does not apply, but there is another provision in the Original Agreement that, during the time the homestead is held by the allottee, it shall not be liable for any debt contracted by the owner thereof while so held by him. If not liable for a debt voluntarily contracted, how can it be said that the land would be liable for a charge placed against it against the will and without the consent of the allottee? The purpose of this provision was to prevent the forced or involuntary sale of the homestead allotment while title thereto remained in the allottee. That is what is sought in the proceedings under consideration. Owners of sewer "tax bills" are asking for the forced sale by the county treasurer, and owners of the paving "tax bills" are asking for foreclosure of their so-called liens and an order of sale thereunder through the court. In view of what we have said, this cannot be done.

It is contended that plaintiff in error had at one time conveyed that part of block 13 which came from her homestead allotment to another person, and that it was subsequently reconveyed to her and thereby having once become liable for general taxes and special assessments, it necessarily continued to be liable therefor.

A careful examination of the record and the instruments therein relied upon will disclose that the contention of defendant in error in this respect cannot be upheld, for two reasons:

1. The instruments relied upon attempt to describe the land therein mentioned by metes and bounds and they themselves show that this particular tract of land, that is, the east 166 2/3 feet of block 13, is not enclosed within any boundaries. In fact no particular tract of land is within the bounds traced, for the reasons that by tracing the lines set out therein no land is enclosed thereby. In other words, the lines so drawn have no common point of beginning and ending. It further appears from the instruments and other transactions had in connection therewith that the block described or referred to as the "home block," being the same as block 13, was not intended to be included within the contract. This block is referred to in the contract as the "home block" and the contract specifically provides that the streets should remain as then laid out around the said "home block." When an attempt was made to plat the land, this block was designated on the plat as "home block." Applying the lines as set out in the instruments relied upon, no one can say that the home block was included or intended to be included within the tract of land attempted to be described by metes and bounds, and which was not, in fact, enclosed by such lines. We think it is affirmatively shown that that part of the block was intended to be excluded therefrom.

2. An examination of the instruments further shows that the contract and deed relied upon were merely trust agreements, and, while the legal title was probably at-

tempted to be conveyed, the equitable title at all times remained in the plaintiff in error. It was especially provided that the man named therein as grantee, Reighard, was to be only a trustee. Suit was brought sometime after the execution of these instruments, and while it is not clear from the record what the purpose of the suit was, it is disclosed that during the course of the trial the party claiming interest under these instruments stipulated that the lands as described therein should be and they were subsequently quitclaimed or deeded back to plaintiff in error. From the whole record, it clearly appears that plaintiff in error had never conveyed away that part of block 13 which was included in her homestead allotment.

It is further contended that plaintiff in error did by her tender and offer to pay the general taxes admit the liability of the land for general taxes, and if liable for general taxes, it was also liable for special assessments. This contention cannot be upheld, for the reason that although her land was not legally liable for the taxes, her offer to pay the taxes would not thereby render the land legally liable therefor. The tender and offer having been rejected, plaintiff in error was, and now is, at liberty to treat the offer as withdrawn.

What we have said, of course, has no application to that part of the block which was never a part of the homestead allotment. That portion of the block, that is, the west 122 1/3 feet thereof, is in the same status as the land of other persons, and is, and was, of course, liable for a general tax as well as special assessments.

Justice may require a reassessment against the west 133 1/3 feet of the block. But this must be in the manner provided by law.

The judgment and decree in favor of the defendants in error should be reversed, and the cause remanded, with directions to grant the injunction as prayed for by Vinita Grotkop, and to dismiss the petition of the Western Construction Company.

BENNETT, HERR, HALL, and JEFFREY, Commissioners, concur.

By the Court: It is so ordered.