## UNITED STATES v. WEST VIRGINIA POWER CO. et al.

### No. 13.

District Court, S. D. West Virginia, At Bluefield.

June 12, 1940.

Lemuel R. Via, Dist. Atty., of Huntington, W. Va., Ralph J. Luttrell, of Charleston, W. Va., and John R. Dyer, of Webster Springs, W. Va., for petitioner.

Jesse Knight, of New York City, R. T. Jackson, of Cleveland, Ohio, and Ernest K. James, of Charleston, W. Va., for respondent West Virginia Power Co.

Joseph M. Sanders and Franklin K. Day, Jr., both of Bluefield, W. Va., for respondent Norfolk & Western Ry. Co.

McCLINTIC, District Judge.

This is a proceeding to condemn lands for the so-called "Bluestone Reservoir Project," which the Federal Government proposes to construct on the New River, a headwater tributary of the Kanawha. It was heard upon the identical demurrers of West Virginia Power Company and Norfolk & Western Railway Company to the petition of the Government seeking to take immediate possession of the land and have commissioners appointed to determine the amount to be paid for it.

The Government's petition first recites an Act of Congress approved August 1, 1888, 25 Stat.L. 357, 40 U.S.C.A. §§ 257, 258, which authorizes generally the acquisition of land by condemnation by any officer of the Government who has been or shall be authorized to procure real estate for public uses, and an Act of Congress, approved July 18, 1918, 40 Stat. 911, 33 U.S.C.A. § 594, providing for the taking of immediate possession of lands upon the filing of a petition for the condemnation of lands, easements or rights of way needed for river and harbor improvements, provided provision has been made for payment of just compensation to those parties entitled thereto.

Next it is stated that the Secretary of War, pursuant to Section 1 of the Rivers and Harbors Act of January 21, 1927, 44 Stat. 1010, and Section 10 of the Flood Control Act of May 15, 1928, 45 Stat. 534, 538, 33 U.S.C.A. § 702j, "caused surveys to be made of projects for flood control and the improvement of navigation" on tributary streams of the Mississippi River, including the New River, and after said surveys had been made, the Chief of Engineers, U. S. Army, prepared a report in which he recommended that a project to be known as the Bluestone Reservoir Project on New River "be constructed for the purposes aforesaid in accordance with the general plans prepared and set forth in the said report." The petition further sets out the approval of this report by the various intermediate boards and commissions as provided by law and the final approval by the Secretary of War and transmission by him of this report and the reports of the intermediate commissions to Congress on January 25, 1935.

Reference is then made to Executive Order No. 7183–A, dated September 12, 1935, signed by the President of the United States, pursuant to the Congressional Act of May 15, 1928, 45 Stat. 534, 33 U.S.C.A. § 702a et seq., ordering and directing the Secretary of War, through the Chief of Engineers, to proceed with the construction of said Bluestone Reservoir Project "in accordance with the report of the Chief of Engineers to the Congress and the plans and specifications submitted therewith, subject to such changes in said plans and specifications as shall be approved by the Chief of Engineers." The provisions of said Executive Order were approved by an Act of Congress passed June 28, 1938, 52 Stat. 1215, which supplements the Act of Congress approved June 22, 1936, 49 Stat. 1570, 33 U.S.C.A. § 701a et seq., "and the acquisition at the cost of the United States of all lands, easements, and rights of way needed for the said Bluestone Reservoir Project was thereby authorized." A portion of the 1936 Act is also quoted in the petition.

Next the petition recites that "pursuant to the Executive Order and the various Acts of Congress and the findings of the Mississippi River Commission as approved by the Board of Engineers for Rivers and Harbors, all of which are referred to above," the necessary funds have been made available by Act of Congress approved June 11, 1938, 52 Stat. 670, and that the Secretary of War requested the Attorney General of the United States to institute proceedings to acquire the lands described "for the purposes hereinafter mentioned."

Paragraph IX of the petition purportedly states the purposes for which the dam is to be built, how it will be built and the uses to which the land taken will be put. It is quoted in its entirety:

"The petitioner proposes to construct, erect, build and maintain a dam on the New River near Hinton, in the County of Summers, and in the State of West Virginia, for the purpose of the improvement of navigation in the Kanawha River and for the purpose of controlling destructive floods on the Mississippi River System, including the Ohio River, and its tributary, the Kanawha River, which in its upper reaches, as hereinbefore alleged, is the New River, and to make available for public uses, the reservoired waters impounded by said dam; that the construction and maintenance of said dam will be commenced and completed in accordance with the report of the Chief of Engineers approved as aforesaid and known as the

Bluestone Reservoir project; that the use and purpose for which your petitioner intends to construct and maintain said dam and the use and purpose for which your petitioner intends to put the said lands hereinafter described is a public one; that the said lands are needed for a proper public use and purpose as aforesaid and that after they have been acquired, such lands will be devoted to the public purposes for which said project has been approved, and that it is necessary that the possession of said lands be awarded to the petitioner on the date of the filing of this petition."

The petition then quotes three sections of the West Virginia Code of 1931, Chapter 1, Article 1, Section 3, Chapter 54, Article 1, Sections 1 and 2, which provide for the acquisition of land in the State of West Virginia by the United States Government for a public use.

Finally it is stated that it is necessary for the "purposes aforesaid" that the lands hereinafter described be acquired for the petitioner and that negotiations for the purchase thereof have failed. Fee-simple title to said lands is sought by the Government.

The demurrers of West Virginia Power Company and Norfolk & Western Railway Company are identical and for the sake of convenience reference will be made only to the Power Company. The demurrer states three grounds upon which respondents rely, which may be summarized as follows: (1) that the petition fails to state the uses or purposes to which the land sought to be taken is intended to be appropriated, as required by Chapter 54, Article 2, Section 2 of the West Virginia Code; (2) that it fails to show that any officer of the United States has been authorized by law to institute the proceeding; and (3) that the instruments of authorization, upon which the petition relies, are void, since they clearly show that the purposes for which the lands are desired include purposes not within the powers of the United States. The real question at issue is whether the Government must recite in its petition that the dam is to be built for power development as well as for flood control and navigation. The first two grounds of demurrer will be discussed together, for this court is of the opinion that the demurrer must be sustained upon either or both of these grounds.

A demurrer tests the legal sufficiency of the pleadings; Chapter 56, Article 4, Section 36, West Virginia Code. As the Power Company has chosen to demur to the petition, thus admitting all facts well pleaded, it becomes necessary to determine only what the petition must recite to be sufficient in law for the condemnation of land by the United States Government and whether such requisites are present in the petition of the Government in this case.

The power of eminent domain is arbitrary in character and subversive of the right of private property and before it can be exercised by any officer of the Government, its delegation to him must plainly appear and may not be deduced from any ambiguous language or by doubtful inference. Laws authorizing public officers to exercise the sovereign power of eminent domain are strictly construed. United States v. A Certain Tract of Land, C.C., 70 F. 940; Delaware, L. & W. R. R. v. Morristown, 276 U.S. 182, at page 192, 48 S.Ct. 276, 72 L.Ed. 523, and authorities cited therein. So it must first clearly appear from the petition that the federal officers are authorized to institute this proceeding and upon what that authority is based. Dept. Public Works v. Lewis, 344 Ill. 253, 176 N.E. 345.

Chapter 54, Article 2, Section 2 of the West Virginia Code, provides that the petition "shall also state the use to which the estate sought to be taken is intended to be appropriated." The reasoning behind this requirement is found in Section 5 of the same article which provides in effect that the court shall not appoint commissioners until "it shall appear to the court * * * the case is one in which the applicant has lawful right to take private property for the purposes stated in the petition * * *." Thus the second requisite to make this petition legally sufficient is that it must clearly and definitely state the uses and purposes for which the land sought to be taken is to be appropriated.

If either one or the other of these requirements is not met upon the face of this petition the demurrer must be sustained. This court is of the opinion that if it can be said that this petition meets the second requirement of properly stating uses and purposes to which the land is to be appropriated, then it must fail to meet the first requirement because it fails

to show authority in the federal officers to condemn the land for the uses and purposes stated therein. On the other hand, if the Acts of Congress and the orders and reports referred to therein, which the petition recites as authority for this proceeding, are the authority relied upon, then the petition is insufficient and demurrable because it fails to properly state all the uses and purposes to which the land sought to be taken will be appropriated as authorized by Congress. If the federal officers are authorized to institute condemnation proceedings for the appropriation of lands for a certain set of purposes, their authority fails if they attempt to appropriate the land taken to any other purpose. And there is a change of purpose when the purpose is stated to be something less than that authorized just as surely as there would be a change if said officers sought to increase the uses to which the land is to be put beyond the uses authorized by Congress.

█ With reference to the instant case, if Congress authorizes the building of a dam and the appropriation of land for the purposes of flood control, navigation and power development, the federal officers have no authority to condemn the land for the purposes of a flood control and navigation dam which would not permit power development; and when said officers are authorized to build a dam and condemn land for flood control, navigation and power development, a petition which recites that the land is to be used for "a proper public use and purpose as aforesaid" after stating that the dam is to be constructed "for the purpose of the improvement of navigation" and "of controlling destructive floods" with no mention whatsoever of power development, fails to "state the use to which the estate sought to be taken is intended to be appropriated" within the meaning of the West Virginia Statute just quoted—and it is therefore demurrable.

A determination of the matters here involved requires a thorough examination of the Acts of Congress, the orders and reports upon which those acts were based, and other facts pertinent thereto.

First it should be understood that this matter has been before the courts before. By an order entered November 16, 1936, this court sustained a demurrer of the West Virginia Power Company to a petition of the United States seeking to condemn the same land for the same Bluestone Reservoir Project. In that petition the authority recited for such proceeding was the Executive Order No. 7183–A, heretofore referred to, which the President of the United States issued pursuant to the National Industrial Recovery Act, 48 Stat. 200, 40 U.S.C.A. § 401 et seq., and the Emergency Relief Appropriation Act of 1935, 49 Stat. 115, and the Acts of July 18, 1918 and August 1, 1888, which are also set out in this petition. Upon appeal from that order to the Circuit Court of Appeals for the Fourth Circuit the order was reversed and the cause was remanded for further proceedings. United States v. West Virginia Power Company, 91 F.2d 611, 614. The first case turned upon the question of whether Executive Order No. 7183–A supplied sufficient authority for the institution of the proceedings. The Circuit Court held that the President's Order was issued under authority granted by Congress under the N. I. R. A. and that this was a proper project under that act, and further, that the court must take judicial cognizance of the Act of Congress approved June 22, 1936, 49 Stat. 1570, 1586 (also cited in the present petition) which went into effect after the filing of the petition therein and which ratified and approved the project and gave "at least by necessary implication, if not by express grant, authority to condemn the required land."

Certiorari was applied for, but the Government dismissed its petition before the case could be heard and passed upon by the Supreme Court of the United States, and did nothing further with it for a period of three years, when it filed the petition here under consideration.

█ When the petition cites Acts of Congress and Executive Orders as authority for a condemnation proceeding a court may take judicial notice of all public documents which are referred to therein and upon which they are based, whether such documents are mentioned in the petition or not. Arizona v. California, 283 U.S. 423, 51 S.Ct. 522, 75 L.Ed. 1154. The petition states that this proceeding is instituted under the authority granted by Congress in an Act of June 28, 1938, 52 Stat. 1215. Section 4 of that Act provides:

"That the following works of improvement for the benefit of navigation and the control of destructive floodwaters and other purposes are hereby adopted and au-

thorized to be prosecuted under the direction of the Secretary of War and supervision of the Chief of Engineers in accordance with the plans in the respective reports hereinafter designated: * * *

"Ohio River Basin

"The general comprehensive plan for flood control and other purposes * * * as set forth in Flood Control Committee Document Numbered 1, Seventy-fifth Congress, first session [which makes no specific reference to the Bluestone Project], with such modifications thereof as in the discretion of the Secretary of War and the Chief of Engineers may be advisable, is approved * * *: Provided further, That the provisions of Executive Order Numbered 7183A, dated September 12, 1935, are approved, and the acquisition at the cost of the United States of all lands, easements, and rights-of-way needed for the Bluestone Reservoir project are hereby authorized * * *."

This authorizes generally the comprehensive flood control plan for the Ohio River Basin but with reference to the Bluestone Project authorizes such project to be carried out in accordance with Executive Order No. 7183–A.

Executive Order No. 7183–A signed September 12, 1935, recites that the Secretary of War, pursuant to various Acts of Congress, caused surveys to be made; that after said surveys had been made the Chief of Engineers, U. S. Army, prepared a report in which he recommended that the Bluestone Reservoir Project "be constructed for the purposes of power development, flood control, and creation of navigation in accordance with the general plans prepared and set forth in said report"; that the Mississippi River Commission, the Board of Engineers for Rivers and Harbors, and the Secretary of War approved said report of the Chief of Engineers; that finding the construction of the Bluestone Project in accordance with the plans prepared under the direction of the Chief of Engineers and approved by him and set forth in his report, "will aid in flood control and in the prevention of soil erosion and stream pollution, and will promote navigation, agriculture, sanitation, and power production; and

"Whereas I further find that the sale, in the manner provided by law, of the power produced at the said project will tend to make the project self-liquidating."

"Now, therefore * * * I hereby order and direct the Secretary of War, through the Chief of Engineers, U. S. Army, to proceed with the construction of said Bluestone Reservoir Project in accordance with the report of the Chief of Engineers * * * and the plans and specifications submitted therewith, subject to such changes in said plans and specifications as shall be approved by the Chief of Engineers."

It should first be stated that this court does not believe the last clause above quoted or the clause in the Act of 1938 permitting changes in plans and specifications is sufficient authorization for a change from a combined power and flood control dam to a dam for flood control alone, and the consequent change in the use of the land to be taken by the federal officers in charge of the proceedings without further action by Congress. Ryan v. Chicago, B. & Q. R. R., 7 Cir., 59 F.2d 137. If such a construction were to be placed upon those clauses, it would be an unlawful delegation of legislative power. Schechter Corp. v. United States, 295 U.S. 495, 529, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947; Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446.

It would hardly be necessary to go back of the Act of 1938 and the Executive Order which it approves to determine that the use and purpose for which the land sought to be taken was authorized was power development as well as flood control and navigation. But an examination of the report of the Chief of Engineers and the reports of the various committees approving the same will more clearly illustrate and support such conclusion. These reports are included in House Document No. 91, 74th Congress, 1st Session.

The recommendation of the Chief of Engineers, page 5 of H. D. No. 91, is as follows: "I therefore recommend the construction by the Federal Government of the Bluestone Reservoir project for the purposes of power development, flood control and navigation in accordance with the general plans set forth in this report * * * at an estimated cost of $13,000,-000, provided that definite agreement is entered into before construction is begun for the disposal of the power * * *." The Report of the Board of Engineers for Rivers and Harbors (page 5 of H. D. No. 91), the Report of the Division Engineer, Upper Mississippi Valley Division, (page

9, H. D. No. 91), and the Report of the Mississippi River Commission (page 17, H. D. No. 91) are similar in character and recommend the adoption of the project as outlined in the report and recommendations of the District Engineer at Huntington, West Virginia; (page 17, H. D. No. 91). The last-mentioned report is very comprehensive and discusses the entire subject of dams in the Kanawha River Basin ending with the following conclusions and recommendations, in part (page 75).

"* * * *" "2. The development of large amounts of hydro-electric power on the headwater tributaries of the Kanawha River appears feasible.

"3. A comprehensive plan for flood control alone is not economically justified.

"4. The control of the flood waters of the Kanawha River for the purpose of reducing lower Mississippi River floods would be excessive in cost when compared to its benefits."

"6. * * * and power development in the headwater tributaries in conjunction with storage reservoirs and with local flood-control benefits incidental thereto."

The supplemental report of the Division Engineer (page 93, H. D. No. 91) deals exclusively with the Bluestone Reservoir Project. The Division Engineer discusses the two general plans of development of the reservoir site which were discussed by the District Engineer in his report, one for flood control alone and the other for flood control in combination with power development. The plan recommended by the District Engineer was the last-mentioned plan (Plan B) combining flood control and power, despite the fact that it would cost approximately three and one-half million dollars more to build and would cut in half the flood control benefits—the reasons given being that the combination flood control and power plan would make the project self-liquidating. This combination plan was also recommended by the Division Engineers "to be prosecuted * * * in accordance with the plans prepared under the supervision of the Chief of Engineers and approved by him, at a total estimated cost of $12,942,000."

The supplemental reports of the Mississippi River Commission (page 96, H. D. No. 91) and of the District Engineer (page 96, H. D. No. 91) both endorse this recommendation, it being stated at page 120 of H. D. No. 91: "Recommendations: The Bluestone Reservoir Project, combining flood control and power development, is recommended for construction under the provisions of the National Recovery Act at an estimated cost of $12,942,000."

House Document No. 306, 74th Congress, First Session, contains further reports of the above-mentioned Engineers and commissions which discuss generally the entire comprehensive plan of Flood Control for the Mississippi River.

■ A study of these various reports indicates that the construction of the Bluestone Dam was recommended to be started immediately, when other projects in the comprehensive system were delayed, principally because the power development would make this project self-liquidating. These reports are all public documents and this court should consider them under the issues raised by the demurrer. The present plans for construction of the dam and the estimated cost thereof prove beyond doubt that this project is for the development of power as well as for flood control. The authority relied upon by the government in its petition is the Act of 1938, which expressly approves Executive Order No. 7183–A for the construction of this particular dam. The order and direction in Executive Order No. 7183–A is to proceed with the construction of the Bluestone Reservoir Project in accordance with the report of the Chief of Engineers, which, as stated in said order and by the Circuit Court of Appeals in the first case of United States v. West Virginia Power Company, supra, recommends the construction of the dam for power development, flood control and navigation. It follows, a priori, that any authority to condemn the land needed for the reservoir site which the Act of Congress or the Executive Order might be said to confer would necessarily be for the same purposes, i. e., power development, flood control and navigation.

Thus it appears that the authority under which the federal officers are acting in instituting this proceeding and upon which they rely in the petition is to take lands for power delevopment, flood control and navigation and for the building of a dam at the Bluestone site under the plans and specifications recommended in the report of the Chief of Engineers. If they attempt to do anything other than that which they were authorized to do the demurrer to the petition must be sustained for failure

to state proper authority to institute these proceedings.

If the respondents' demurrer is to be overruled, the petition must specifically and clearly state the uses to which the land to be taken is intended to be appropriated. Section 2 of Article 2 of Chapter 54, West Virginia Code, requires such a statement of uses in the petition. The petition in this case seeks the appointment of commissioners to ascertain the just compensation to be paid the owners of the land to be taken. Section 5 of the above-cited Article of the West Virginia Code provides for the appointment of such commissioners "when it shall appear to the court * * * that the case is one in which the applicant has lawful right to take private property for the purposes stated in the petition * * *."

Considered in the light of the above-cited sections of the West Virginia Code, the mere allegation in the petition that the land to be taken is to be devoted to a public use does not meet the requirements of those sections. If such an allegation were held to be sufficient, those two sections would be held for naught. It is impossible for a court to determine from such an allegation whether "the case is one in which the applicant has lawful right to take private property." The provisions of those two sections require a specification of all the uses to which the land will be put so that the court may determine whether they are proper public uses. Cincinnati v. Vester, 281 U.S. 439, 448, 50 S.Ct. 360, 74 L.Ed. 950; Miocene Ditch Co. v. Lyng et al., 9 Cir., 138 F. 544.

What are the allegations in the petition here under consideration? Paragraph IX of the petition purports to state the uses to which the land is intended to be appropriated. That paragraph first states that "The petitioner proposes to construct * * * a dam * * * for the purpose of the improvement of navigation * * * and for the purpose of controlling destructive floods * * * and to make available for public uses, the reservoired waters impounded by said dam". Thus far there is no allegation of the uses and purposes to which the land is to be appropriated.

Quoting further from said paragraph: "that the use and purpose for which your petitioner intends to construct and maintain said dam and the use and purpose for which your petitioner intends to put the

said lands hereinafter described is a public one; that the said lands are needed for a proper public use and purpose as aforesaid and that after they have been acquired, such lands will be devoted to the public purposes for which said Project has been approved."

Paragraph XI also uses the phrase "to be used for the purposes aforesaid." Nowhere else in the petition does there appear an allegation of the uses and purposes to which the land to be taken will be put.

The "use and purpose as aforesaid" apparently refers to the statement of the purposes for which the dam is to be built—which are stated to be flood control and navigation. But the petition further alleges that "such lands will be devoted to the public purposes for which said Project has been approved." Such purposes, as shown by the Executive Order which was approved by Congress and as heretofore discussed, are "power development, flood control, and creation of navigation." Thus the petition is either inconsistent and vague or it fails to state the purposes for which the land will be used as required by the West Virginia statute.

This court is of the opinion and so holds that the allegations in the petition that the lands are to be used for flood control and navigation, with no mention anywhere in the petition of power development, do not meet the requirements of Chapter 54, Article 2, Sections 2 and 5, West Va. Code, when it is obvious from the acts, orders and reports authorizing the project that the dam is to be built and the land used for the purpose of power development as well as flood control and navigation. The allegation that the land is to be used for flood control and navigation is a sufficient allegation of a public use on the face of it but being cognizant of the fact that the land is intended to be appropriated to the use of power development as well as flood control and navigation, this court does not feel that such allegations are sufficient. Even if it were held that such insufficiency could not be reached by demurrer, and that the court could not look beyond that allegation in the petition, the demurrer would have to be sustained on the second ground, for no authority is recited in the petition for the federal officers to institute proceedings for the condemnation of land for purposes of flood control and navigation alone.

This holding makes unnecessary and improper a discussion of the Constitutional question raised by the third ground in the demurrer.

The demurrer is sustained and permission is given the petitioner to amend its petition.