UNITED STATES of America,
Plaintiff,

v.

2,005.32 ACRES OF LAND, MORE OR LESS, SITUATE IN CORSON COUNTY, SOUTH DAKOTA; and Sioux Indians of Standing Rock Reservation, et al., and Unknown Owners, Defendants.

Civ. No. 722.

United States District Court
D. South Dakota, N. D.

March 10, 1958.

Clinton G. Richards, U. S. Atty., Sioux Falls, S. D., H. R. Jackson, Lemmon, S. D., and Robert L. Jones, Sioux Falls, S. D., Asst. U. S. Attys., for plaintiff.

Marvin J. Sonosky, Washington, D. C., for Standing Rock Sioux Tribe.

MICKELSON, Chief Judge.

As a part of the land acquisition program for the Oahe Dam and Reservoir project, the United States of America by the Secretary of the Army has commenced condemnation proceedings against 6.45 acres of Indian tribal land, designated as Tract R–1825, belonging to the Standing Rock Sioux Indian Tribe and located on the Standing Rock Indian Reservation in South Dakota. The matter before the court is a motion by the Tribe to dismiss the complaint in condemnation and the declaration of taking as to this tract on the grounds that Congress has not authorized the condemnation of tribal lands on the Standing Rock Reservation. Although the amount of land here involved is not large, the matter has considerable significance because the Oahe project will eventually require large acreages of tribal and allotted Indian lands. The pending motion has been argued orally to the court, and briefs have been submitted by counsel on both sides.

The land in question is part of a vast reservation set aside for the Sioux Nation by a treaty between the United States and the Sioux on April 29, 1868, 15 Stat. 635. By Article 2 of that treaty, the United States agreed that the reservation land was "set apart for the absolute and undisturbed use and occupation of the Indians". Under Article 11 of that treaty, the Tribe agreed to relinguish all right to permanently occupy land outside the reservation, and further agreed not to object to the construction of "railroads, wagon roads, mail stations, or other works of utility or necessity, which may be ordered or permitted by the laws of the United States". A proviso of Article 11 stated that, in the event such roads or other works were constructed on reservation land, the amount of damages would be assessed by three commissioners, one of whom was to be a chief of the Indians. Also pertinent to the rights of the Indians to the reservation land was Article 12, which stated:

"No treaty for the cession of any portion or part of the reservation herein described which may be held in common shall be of any validity or force as against the said Indians, unless executed and signed by at least three fourths of all the adult male Indians, occupying or interested in the same;".

By the subsequent treaties of 1877, 19 Stat. 254, and 1889, 25 Stat. 888, the original reservation was reduced and formed into separate reservations, one of which was the present Standing Rock Reservation. Both of these later treaties, by Article 8 of the 1877 treaty and by Section 19 of the 1889 treaty, kept the above-mentioned provisions of the 1868 treaty in force.

In addition to the provisions of the 1868 treaty, the following statute has importance in relation to the subject of the alienation of Indian lands:

"No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution." 25 U.S.C.A. § 177.

The question presented by this motion, therefore, is whether, in view of this legislation and the treaty provisions, considered in the light of the history of Congressional and judicial treatment of Indians, the Secretary of the Army has sufficient authorization from Congress to acquire this tribal land by condemnation.

■■■■ Certain principles of law are not disputed by either the Tribe or the Government, but a recitation of these principles will assist in placing the issue here in its proper perspective. The right of eminent domain, which is the power to take private property for public use, is an inherent incident of sovereignty requiring no constitutional recognition, and the provision of the Fifth Amendment to the federal Constitution that just compensation be paid for property taken is merely a limitation upon the use of that right. United States v. Jones, 1883, 109 U.S. 513, 3 S.Ct. 346, 27 L.Ed. 1015; United States v. Federal Land Bank of St. Paul, 8 Cir., 1942, 127 F.2d 505, 508. The right to authorize the exercise of eminent domain lies only in the Congress, and an agency or officer of the United States may take property only to the extent of the Congressional authorization. United States v. North American Transportation & Trading Co., 1920, 253 U.S. 330, 40 S.Ct. 518, 64 L.Ed. 935; United States ex rel. Tennessee Valley Authority v. Welch, 1946, 327 U.S. 546, 66 S.Ct. 715, 90 L.Ed. 843; Youngstown Sheet & Tube Co. v. Sawyer, 1952, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153. Congress has the power to authorize the taking of Indian tribal lands. Cherokee Nation v. Southern Kansas Ry. Co., 1890, 135 U.S. 641, 10 S.Ct. 965, 34 L.Ed. 295. Where there is a treaty with Indians which would otherwise restrict the Congress, Congress can abrogate the treaty in order to exercise its sovereign right. Thomas v. Gay, 1898, 169 U.S. 264, 18 S.Ct. 340, 42 L.Ed. 740; Choate v. Trapp, 1912, 224 U.S. 665, 32 S.Ct. 565, 56 L.Ed. 941.

■■ It is obvious, then, that Congress has the authority to condemn the tract in this case, and this can be done even though it is in abrogation of the treaty provisions. But this is not to say that the treaty provisions are to be ignored, but instead it is to require that there be clear Congressional action which indicates an intention to abrogate the terms of the treaty. Manifestly, this must be so if the treaty is to have any meaning at all. By the very existence of the treaty, providing that the reservation land be set aside "for the absolute and undisturbed use and occupation of the Indians" and that there be no cession of the land except with the consent of three-fourths of the adult male Indians, a special situation has been created which requires different treatment for this Indian land than for non-Indian land. Non-Indian land is not held by virtue of such a treaty, nor has it been acquired under the circumstances in which these treaties have been made. The minimum meaning of these treaty provisions, containing solemn promises to the Indian people by the government of the United States, is that they stand as the highest expressions of the law re-

garding Indian land until Congress states to the contrary. The Indians are entitled to depend on the fulfilment of the terms of the treaty until the Congress clearly indicates otherwise by legislation. In any such enactment, Congress, as the guardian of the Indians, ordinarily makes ample provision for the interests of its wards. This places no unconscionable burden on the United States nor in any way impairs its sovereignty over the Indians, but merely requires a recognition of the special situation of the Indians. As will be pointed out herein, the Congress, over a long period of time, has acted constantly in accord with this requirement.

■■ In its complaint and its declaration of taking, the Government cites five statutes to show the authority under which it is attempting to condemn this tract of tribal land. Since the established rule is that the party seeking to exercise the right of eminent domain has the burden of showing his authority, 1 Nichols on Eminent Domain, Sec. 3.213, and the existence of the 1868 treaty necessitates a Congressional intention to abrogate the applicable provisions of that treaty, the burden is on the Government in this case to show that one or more of these five statutes indicate a Congressional intention to abrogate the treaty provisions, thereby giving the Government the requisite authority to condemn the land.

■ The first statutes cited in the complaint are 33 U.S.C.A. § 591 and 33 U.S.C.A. § 701. Sec. 591 empowers the Secretary of the Army to acquire lands by condemnation for river and harbor projects "for which provision has been made by law." Sec. 701 extends this power to flood control projects. Unquestionably, the two statutes form the basis of the condemnation authority possessed by the Secretary of the Army in acquiring ordinary lands in the prosecution of such projects. However, by no stretch of the imagination can it be said that Congress, in the enactment of these laws, had in mind the specific situation of the Standing Rock tribal lands, or even Indian lands in general.

■ The principal statute upon which the Government relies is the Flood Control Act of 1944, 58 Stat. 887. Sec. 9(a) of this act gave general approval to the prosecution of designated plans for the development of the Missouri River Basin program. There is no mention of Indian lands in the act itself, but the Government calls attention to an excerpt from one of the Senate and House documents which contained the designated plans:

"The proposed reservoirs will inundate Indian lands at several points. The estimates submitted on the over-all costs of the projects include funds to cover the cost of taking such lands, and buildings, including relocation of burial grounds. It is to be understood, therefore, that approval of this plan includes authority for the Indians through their tribal councils, with the approval of the Secretary of the Interior, to convey and relinquish such property to the United States, and authority for the Secretary of War to enter into appropriate agreements with the Secretary of the Interior and the Indian tribes concerned for the payment of the fair value of the property taken, or for the contribution of a sum approximating such value toward locating or constructing or toward relocating or reconstructing buildings, works, facilities, or water projects in the vicinity of the Missouri River or its tributaries." Senate Document 247, 78th Congress, 2nd Session, page 4.

This portion of the Senate document was an excerpt from a letter sent by the Chief of Engineers to the Chairman of the Committee on Flood Control of the House of Representatives. While we agree with the Government that this letter plainly discloses that Congress was aware that Indian lands would be acquired in the proposed projects, this court cannot hold

**198**

that such an awareness or knowledge on the part of Congress indicates an intention to authorize condemnation proceedings as the method of acquiring these Indian lands. To the contrary, this letter indicates that Congress recognized the special situation regarding the Indians, and desired that some mutually agreeable plan be worked out for the acquiring of these lands. This letter contemplates no more than voluntary negotiations, with no implication of what proceedings might be taken in the event of the failure of such negotiations. As will be pointed out infra, Congress subsequently followed the thinking expressed in this letter by providing for specific voluntary negotiations to be made in relation to tribal lands on the Standing Rock Reservation and on other reservations. The Flood Control Act of 1944 cannot be the legislation necessary to authorize the taking of Indian tribal lands unless it could be held that a general law approving a series of particular projects can be applied to specific Indian lands which are bound by treaty. We believe such a holding to be untenable. General legislation is not sufficient to include Indian tribal lands.

 The fourth statute cited in the complaint is the Public Works Appropriation Act of 1956, 70 Stat. 474, 480. This is no more than an appropriation act limited to "projects authorized by law", and adds nothing to the 1944 Flood Control Act insofar as authority to take Indian tribal lands is concerned.

 The last statute, which is cited in the declaration of taking, is the Declaration of Taking Act. 40 U.S.C.A. § 258a. This law merely provides for the procedure in condemnation suits and does not authorize the taking of Indian tribal lands by condemnation.

 Since all of the authorities relied upon by the Government are general statutes which do not refer to Indian lands, it is important to note that the Supreme Court has frequently held that general legislation does not apply to Indians. The rule is well stated in Elk v. Wilkins, 1884, 112 U.S. 94, 5 S.Ct. 41, 43, 28 L.Ed. 643, where an Indian's claim to United States citizenship on the basis of being a "persons born * * * in the United States" within the meaning of the Fourteenth Amendment was rejected in the following language:

"The Indian tribes, being within the territorial limits of the United States, were not, strictly speaking, foreign States; but they were alien nations, distinct political communities, with whom the United States might and habitually did deal, as they thought fit, either through treaties made by the president and senate, or through acts of congress in the ordinary forms of legislation. The members of those tribes owed immediate allegiance to their several tribes, and were not part of the people of the United States. They were in a dependent condition, a state of pupilage, resembling that of a ward to his guardian. Indians and their property, exempt from taxation by treaty or statute of the United States, could not be taxed by any state. *General acts of Congress did not apply to Indians, unless so expressed as to clearly manifest an intention to include them.* (Emphasis added.) 112 U.S. at pages 99, 100, 5 S.Ct. at page 44.

In addition to the numerous authorities which are cited therein to support this statement of the law, see the following decisions subsequent to the Elk case: United States v. Rickert, 1903, 188 U.S. 432, 23 S.Ct. 478, 47 L.Ed. 532; Choate v. Trapp, 1912, 224 U.S. 665, 32 S.Ct. 565, 56 L.Ed. 941; Squire v. Capoeman, 1956, 351 U.S. 1, 76 S.Ct. 611, 100 L.Ed. 883; Lewellyn v. Colonial Trust Co., 3 Cir., 1927, 17 F.2d 36; McCandless v. United States, 3 Cir., 1928, 25 F.2d 71; Chouteau v. Commissioner of Internal Revenue, 10 Cir., 1930, 38 F.2d 976; 340 Op.Atty.Gen. 439, 444 (1925). These authorities clearly point out that, because

of the peculiar situation of the Indians which has resulted in a guardian-ward relationship with our country, Congress, in the enactment of legislation, is obliged to indicate when such legislation is intended to be applied to Indians and their property.

That Indians are the subject of special legislation is particularly evident from the existence and content of Title 25, Indians, of the United States Code. Contained therein is a myriad of laws pertaining to the protection and education of Indians, agreements with Indians and the performance by the United States of obligations thereunder, Indian agencies, and six chapters of laws having as their principal subject, Indian lands.

Although we have occasionally used the term "Indian lands", the case at bar involves only "Indian tribal lands" as distinguished from "Indian allotted lands". Of signal importance, then, is the fact that Congress has seen fit to specifically provide by statute that lands allotted in severalty to Indians could be condemned for public purposes. Act of March 3, 1901, 31 Stat. 1084, 25 U.S.C.A. § 357. But the passage of this act only serves to emphasize that no comparable authority to condemn "Indian tribal lands" has ever been given. The very existence of this act allowing condemnation of Indian allotted lands is graphic evidence that Congress itself felt it necessary, because of the provisions of the various treaties and legislation prohibiting alienation of Indian lands, to clearly provide the right to condemn Indian allotted lands.

Even more significant is the following record of Congressional dealings with Indian tribal lands, many of these acts being in connection with the Missouri River Basin program:

(1) Act of August 19, 1937, c. 702, 50 Stat. 700, wherein the Secretary of the Interior is authorized to acquire tribal lands on the Shoshone Indian Reservation for the Wind River irrigation project in Wyoming, with the deposit of certain funds by the Government to operate as an extinguishment of all right, title and interest the Indians possess in the land;

(2) Act of July 8, 1940, c. 552, 54 Stat. 744, providing outright that all right, title and interest of the Indians in the tribal and allotted lands of the Fort Mohave Indian Reservation in Arizona and the Chemehuevi Reservation in California, as designated by the Secretary of the Interior, is granted to the United States for the Parker Dam and Reservoir project, with the Secretary of the Interior given the authority to determine the amount of compensation;

(3) Act of May 2, 1946, c. 247, 60 Stat. 160, 167, which prohibited expenditures of appropriations for the Garrison Dam and Reservoir project, a part of the Missouri River Basin program, until the Secretary of War, through the Secretary of the Interior, had selected and offered to the Three Affiliated Tribes of the Fort Berthhold Reservation, land comparable in quality and sufficient in area to compensate the tribes for lands on the reservation which would be flooded;

(4) Joint Resolution of October 29, 1949, c. 790, 63 Stat. 1026, providing for negotiations by Government officers with the Three Affiliated Tribes of the Fort Berthhold Reservation for payments for allotted and tribal lands to be taken, and further providing that, upon the rejection of the Government appraisal, the Department of the Army shall institute condemnation proceedings;

(5) Act of July 18, 1952, c. 946, 66 Stat. 780, wherein the Secretary of the Interior, for a reasonable consideration not to exceed a certain amount, is authorized to convey to the United States property and rights of the Shoshone and Arapaho Indian Tribes needed by the United States for the Boysen Unit of the Missouri River Basin program;

(6) Act of September 3, 1954, c. 1260, 68 Stat. 1191, providing for the ratification by Congress and by three-fourths of the adult Indians of the Cheyenne River Indian Reservation of a certain agree-

ment for payment of compensation for tribal and allotted lands required to be taken for the Oahe Dam and Reservoir project and for payment for the costs of relocation of the members of the Tribe and their property, and that upon such ratification the agreement acts as a conveyance of the lands to the United States;

(7) Act of August 3, 1956, c. 931, 70 Stat. 987, authorizing the Shoshone and Arapaho Tribes of the Wind River Reservation to convey their interest in certain tribal land to the United States for a sum mutually agreeable to the Tribes and the Secretary of the Interior, with the provision that in the event of a failure to agree on a price, the Secretary shall report the same to Congress and, thirty days afterwards, proceed to acquire the land by eminent domain.

The above list of enactments is not meant to be exhaustive, but does fairly represent the legislative pattern of dealing individually with Indian lands where the same are required for public projects. It is particularly significant that in several of the acts, the Congress has specifically provided for the institution of condemnation proceedings in the event of the failure of voluntary negotiations.

Of particular importance in this case is the Act of September 30, 1950, c. 1120, 64 Stat. 1093, which authorized and directed the Chief of Engineers and the Secretary of the Interior to "negotiate contracts" with the Sioux Indians of the Standing Rock and Cheyenne River Reservations for the conveyance of the Indians' interests in tribal and allotted lands required for the Oahe project and for the payment of just compensation for the land to be taken together with payment of the costs of relocating and reestablishing the tribes and their individual members. The act further provided that any such contracts negotiated should be submitted to Congress within eighteen months (extended to twenty-eight months by Act of April 8, 1952, c. 165, 66 Stat. 46) after the date of enactment

of the act, and that no contract would take effect until ratified by Congress and three-fourths of the adult male members of the two tribes; and that in the event the parties are unable to agree on any item, such items are to be set forth separately in a report to Congress. This act, like the others mentioned above, is in line with the thinking expressed in the letter from the Chief of Engineers noted supra, and it stands as evidence that Congress contemplated only voluntary negotiations with the two tribes. This 1950 act merely established the machinery for entering into such negotiations. But singularly missing, insofar as any reliance on this act for an indication of Congressional intention to acquire these lands by condemnation, is any reference to what proceedings might be taken in the event of unsuccessful negotiations. An agreement was completed with the Cheyenne Tribe which culminated in the Act of September 3, 1954, c. 1260, 68 Stat. 1191. Counsel for the Government has informed the court that negotiations with the Standing Rock Tribe were unsuccessful, but this court has been able to find no indication that Congress was ever notified of such result in accordance with the directions of the act. Certainly Congress, which took the effort to enact special legislation providing for these negotiations, should be informed of the results of the 1950 enactment, as amended in 1952, and of the present state of affairs.

The Government places some importance on the last sentence of the 1950 act which states that nothing in the act shall be construed to restrict or delay the Oahe project. This reveals little more than an intention to continue with the Oahe project during these negotiations.

 In considering whether the Government has sufficiently upheld its burden of showing a Congressional intention to abrogate the 1868 treaty provisions, two other principles of law should be kept in mind. In the first instance, any statute allegedly authorizing eminent

domain is to be strictly construed against the taking party. Delaware, Lackawanna & W. R. Co. v. Town of Morristown, 1928, 276 U.S. 182, 48 S.Ct. 276, 72 L.Ed. 523; United States v. A Certain Tract of Land, C.C.E.D.Penn.1894, 70 F. 940; United States v. West Virginia Power Co., D.C.S.D.W.Va.1940, 33 F.Supp. 756. A fortiori, where the taking party is the guardian and the party subject to the power of eminent domain is the ward, this principle would have all the more application. This leads to the second principle, that statutes concerning the rights of Indians are to be liberally construed in their favor. Choate v. Trapp, 1912, 224 U.S. 665, 32 S.Ct. 565, 56 L.Ed. 941; Alaska Pacific Fisheries Co. v. United States, 1918, 248 U.S. 78, 39 S.Ct. 40, 63 L.Ed. 138. The Supreme Court in the Choate case said:

> "But in the government's dealings with the Indians the rule is exactly the contrary. The construction, instead of being strict, is liberal; doubtful expressions, instead of being resolved in favor of the United States, are to be resolved in favor of a weak and defenseless people, who are wards of the nation, and dependent wholly upon its protection and good faith. This rule of construction has been recognized, without exception, for more than a hundred years, and has been applied in tax cases." 224 U.S. at page 675, 32 S.Ct. at page 569.

When the issue in the instant case is considered in the light of the above principles, there is little doubt of what this court's decision must be.

The Government has not taken any very tangible or consistent position in its opposition to the Tribe's motion to dismiss. However, because of the importance of the case, we feel that we should mention each of the Government's arguments, namely: (1) that the 1868 treaty, by Article 11, included the consent of the Tribe to land acquisitions such as the instant one; (2) that Indian lands are subject to the right of eminent domain the same as other lands; (3) that it is not meritorious to object to the lack of specific authority to take tribal lands; (4) that any requirement in regard to the taking of Indian lands has been met by the letter from the Chief of Engineers and similar memoranda which prove that Congress, in authorizing the Missouri River Basin program, was aware Indian lands would be flooded and would have to be acquired; (5) that the Government is not estopped in its dealings with the Standing Rock Tribe because of its prior dealings with other Indian tribes, nor is it estopped by the act of 1950; (6) that Henkel v. United States, 1915, 237 U.S. 43, 35 S.Ct. 536, 59 L.Ed. 831; United States v. 5,677 Acres of Land, D.C.Mont.1957, 152 F. Supp. 861; United States v. 21,250 Acres of Land, D.C.W.D.N.Y., 161 F.Supp. 376, all support the Government's opposition to this motion; (7) that to hold for the Tribe here would be to require the Government to proceed in an illegal manner as a trespasser.

As to the first argument, it is unreasonable and contrary to the rule of *ejusdem generis* to include the huge takings of reservation land which the Oahe project will require, within the context of the provision of Article 11 of the 1868 treaty concerning "other works of utility or necessity." Further, if the present acquisition were so included within the meaning of the treaty, the Government is not proceeding to determine compensation in the manner provided therein.

Arguments (2) and (7) meet no disputable point and have no bearing on the issue for determination here.

Arguments (3) and (4) have been sufficiently met by the Tribe, and have been previously discussed in this opinion.

Argument (5) is based on a misconception of the Tribe's position in this case. The Tribe does not contend that the Government is estopped by its past conduct, but only that such past conduct is im-

portant in considering the question here before the court.

None of the cases cited under argument (6), although having some similarity, involve the precise point here presented. The Henkel case involved allotted land and arose in a completely different factual situation which included a treaty with the Blackfeet Indians that specifically reserved to the Government the right to use the lands for certain public improvements. The Montana case was presented mainly on the issue of the power of the United States to condemn in the face of particular statutes which the Indians contended specifically forbade such condemnation. We are informed by counsel for the Standing Rock Tribe that the Montana court, acting through a different judge, has recently called for further briefs from both sides in that case, indicating a review of the decision therein. The New York case involved the denial of a motion to vacate an order of taking giving the Government officers the right to survey Indian tribal lands. Although one of the grounds for the motion was the lack of authority to condemn the land, the court's opinion shows that the matter was considered in the light of treaty provisions and legislation different from that in the case at bar. Further, the court's decision on that ground rests mainly on the Cherokee Nation case, supra, which stated no more than the proposition that Congress can authorize the condemnation of Indian tribal lands, a principle which is not questioned here. Subsequent to its decision on the motion to vacate, the same court, in denying a Government motion to strike the affirmative defense of lack of authority to condemn from the answer, said of its prior decision:

"We do not regard that decision as of sufficient authority to strike otherwise unobjectionable portions of defendant's affirmative defense in view of the stringent requirements placed on defendant by F.R. C.P. 71(e)." United States v. 21,250 Acres of Land, Civil No. 7279, W.D. N.Y., June 11, 1957 (unreported).

Counsel for the Standing Rock Tribe has informed us that thereafter, the Seneca Nation, which was the Tribe of Indians involved in the New York case, brought suit in the District of Columbia to enjoin the Government officers from going forward with the project contemplated, and the United States District Court for the District of Columbia overruled a motion to dismiss the complaint. Seneca Nation v. Brucker, D.C.D.C., Civil No. 2202–57, December 17, 1957 (unreported). The current status of the cases in both New York and the District of Columbia present no controlling authority upon which this court can rely.

For all the foregoing reasons it is clear to this court that Congress has never provided the requisite authority to the Secretary of the Army to condemn this tribal land. The Government admits that the five statutes relied upon do not specifically authorize such condemnation, and the contention that these general enactments can be used by the United States, which is the guardian, to take the lands of the Indians, who are its wards, is wholly repugnant to the entire history of Congressional and judicial treatment of the Indians, and, further, is a view which is quite unacceptable to this court.

In order to emphasize the issue in this decision, we wish to restate that the authority of Congress to exercise the right of eminent domain over Indian tribal lands is not questioned. We are granting the motion of the Tribe because of a lack of exercise of this authority. The matter can be speedily remedied by bringing it to the attention of the Congress.

The defendant Tribe's motion to dismiss will be granted. Defendant Tribe's counsel may prepare and submit a form of judgment dismissing the complaint and the declaration of taking, as to Tract R–1825.